190 So.2d 734

**Albert R. OWENS**

**v.**

**Charles WOOD.**

**7 Div. 836.**

Court of Appeals of Alabama.

Sept. 27, 1966.

Rowan Bone, Gadsden, for appellant.

L. D. Martin, Gadsden, for appellee.

CATES, Judge.

This appeal was submitted on written argument May 5, 1966.

Wood, in an action against Owens as the purported payee of two checks, recovered judgment for $438.43 based on verdict.

The principal question on appeal is whether or not one Jack Mays had authority to negotiate the checks.

I.

Mays came into Wood's Grocery in South Gadsden on September 15, 1959. He presented a check of even date drawn by Mrs. John R. Draper to the order of Dixie Floor Sales Company on The First National Bank of Gadsden. The amount was $58.40.

The reverse bears the following:

"Dixie Floor Sales Co.
1407 So. 11th St.
Gadsden, Alabama [1]
Jack Mays
Charles Wood."

At least seventy-four days later (November 28, 1959), Mays got Wood to cash another check for $273.75. This was payable to the order of Dixie Floor Sales and was issued as a cashier's check of Alabama City Bank of Gadsden.

It was endorsed:

"Dixie Floor Sales
Jack Mays
Wood's Gro.
Frank Hood Jr."

—then a rubber stamped endorsement:

"Pay to the order of
The American National Bank
Gadsden, Ala.
Gadsden Cigar & Candy Co."

Each check was sued on separately by separate counts in Wood's complaint. Counts One and Two are adapted from Form 4, Code 1940, T. 7, § 223, using allegations of protest after payment.

Mays, the purported agent, had worked for Owens as a soliciting sales agent. In 1959 Mays had given Wood a price quotation in behalf of Dixie Floor Sales for a job at Wood's Dairy Dip.

On October 15, 1959, Wood paid Mays $130 for the job. This payment was cash. Mays gave him a receipt on a printed form at the foot of which he wrote "Jack Mays Dixie Floor Sales."

Wood testified that he had cashed a number of "business type checks" made out to "Dixie Floor Sales." These were endorsed, "Dixie Floor Sales by Jack Mays."

Record page 22 (Wood's cross-examination) reflects, in part:

1. This legend was made by rubber stamp.

"Q When the job was satisfactory, you made that payment to Mr. Mays?

"A Yes, sir.

"Q You paid him cash?

"A Yes, sir.

"Q And he gave you a receipt right there?

"A Yes, sir.

"Q You never received a bill or anything like that for this job?

"A Well, he just came in the store one day and we just paid him. He didn't—

"Q All right, sir, now, I will ask you whether or not you remember about three months after this work was completed did Rudy Owens contact you about payment for the job?

"A Yes, he did.

"Q Three or four months later. Three or four months after you had actually paid it to Jack Mays?

"A I don't think it was quite that long, but sometime after that.

"Q Some several months then?

"A I would say about thirty days.

"Q After you had already paid Mays?

"A Yes, sir.

"Q You were contacted by Rudy Owens?

"A He came to the store personally.

"Q What did he tell you?

"A Something similar, 'I've got a bill here that needs to be paid'. That is when we produced our receipt.

"Q Was that the receipt and bill for the work that had been done for you?

"A Yes, sir.

"Q And at that time you showed him the receipt where you had already paid Jack Mays the money?

"A Yes, sir.

"Q And that receipt that you showed us there, that was the receipt you yourself showed Mr. Owens at the store and it was made by Jack Mays, is that right?

"MR. MARTIN: We object. It speaks for itself.

"MR. SMITH: Where is it then?

"Q The form here, Mr. Wood, that is what I am trying to get at. Is this the form you yourself keep in your own store? This was presented to you by Mr. Mays and he filled it out for you?

"A Yes, I believe that is.

"Q This is one of your own receipt blanks and receipt by him?

"A He wanted to mark it paid with a receipt.

"Q That is not the receipt then that was furnished by Mays?

"A I never have seen any of Dixie Floor Sales' receipts. I don't know.

"Q It was sometime after you had received that receipt that you had a conversation with Mr. Owens about why you hadn't paid your bill?

"A Yes, sir."

On cross Wood stated he had no recollection of cashing any "pay checks" made payable to Mays from Dixie Floor Sales.

However, he, "within a six months period or whenever it might have been," had cashed some ten checks made payable to Dixie Floor Sales. Wood was unable to remember by whom any of the ten checks had been made. Part of his cross-examination elicited:

"Q What did this Jack Mays tell you his position was with this Dixie Floor Sales? Did he ever tell you actually what his title was?

"A I believe he told us that he was— It's been a long time. It seems like he told us, the way I remember it, he said that he was a manager, kind of looking after the shop while the boss was out and such as that."

·Wood alone testified in his behalf. No evidence was adduced in support of the averments in both counts of the complaint as to protest other than oral to Owens.

Owens testified that Mays had worked for him from a time some eight months before the checks in suit were passed.

May's "duties were straightening up in the morning and going out and making estimates to customers for sales." He was paid a base salary of "$50.00 [a week?] plus commission." He also authorized Mays to make bank deposits for him, but "only when given to him to carry specifically to the bank for an errand."

Owens denied that he had ever authorized Mays "to go ·cash a check." He first learned of Mays's intercepting payments in April, 1960.

At that time Mr. Owens's bank looked at his passbook and advised him that some of the deposit entries bore forged signatures purporting to be those of the receiving tellers.

## II.

Appellant's argument is headed "Assignment of Error 8," i. e., the court below erred in overruling appellant's motion for a new trial.

·This scattergun pleading thus picks up seven grounds derivatively.

The gist of the appellant's argument is that the verdict was contrary to the great weight of the evidence since there was no authority, actual or apparent, shown by the evidence of Mays's being an agent for Owens whose duties would embrace cashing checks for Owens.

Section 19 of the Uniform Negotiable Instruments Law provides:

"The signature of any party may be made by a duly authorized agent. No particular : form of appointment is necessary for this purpose; and the authority of the agent may be established as in other cases of agency."—Code 1940, T. 39, § 23.

January 1, 1967, this will be § 3–403, Uniform Commercial Code, Michie's Code, T. 7A, § 3–403.

To sign for another may be by (a) express words, e. g., a letter, power of attorney or parole; ·(b) by implication of law; or (c) inference from fact.

Approaching this case from the burden of proof, we note, *first,* that Wood must prove that Mays was authorized to sign Owens's name to the two checks. For simplification, we treat Owens as being the alter ego of "Dixie Floor Sales."

Presumptively, without a designation such as "Dixie Floor Sales by Jack Mays as its agent" makes Mays a guarantor of prior endorsements. Code 1940, T. 39, § 24.

Hence, Wood faced as one alternative the onus of showing that Code 1940, T. 39, § 27,[2] was not operative. This because of Mays's failure to designate himself as agent (without proof of Owens's actual signature) raised a rebuttable presumption of forgery of Owens's endorsement.

The other alternative—the need to prove a positive—was for Wood to establish that Owens had given Mays authority to act.

We lay to one side, except as a landmark between Scylla and Charybdis, the "per pro." or "per proc." endorsement customary in English practice. Our Negotiable Instruments Law carries this provision—Code 1940, T. 39, § 25, which reads:

"§ 25. A signature by 'procuration' operates as notice that the agent has but lim-

2. "Where a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority."

ited authority to sign, and the principal is bound only in case the agent in so signing acted within the actual limits of his authority."

■ Unlike § 3–403 of the new Uniform Commercial Code, our Negotiable Instruments Law puts a prima facie gloss of regularity on the position of a "holder" of unmatured paper. Code 1940, T. 39, § 61 (until January 1, 1967), provides:

"§ 61. Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course. But the last mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title."

Section 90, as to notice of dishonor, provides:

"§ 90. Except as herein otherwise provided, when a negotiable instrument has been dishonored by nonacceptance or nonpayment, notice of dishonor must be given to the drawer and to each indorser, and any drawer or indorser to whom such notice is not given is discharged."

■ A check which has circulated among various persons should be presented to the bank "within a reasonable time [3] after the last negotiation thereof." Code 1940, T. 39, § 73; N.I.L. § 71; U.C.C. § 3–503(2) (seven days after indorsement).

In O'Neal v. Clark, 229 Ala. 127, 155 So. 562, 94 A.L.R. 589, it was held that if paper is payable at a bank, the notice of dishonor must show that "it was at the bank at maturity." The cause was remanded.

On the second appeal Clark v. O'Neal, 231 Ala. 577, 165 So. 853, on rehearing, the Supreme Court's language is emphatic:

"* * * The contract of indorsement requires, as the sine qua non of liability, in the absence of a waiver, *presentment of the instrument for payment at the proper time and place,* and due notice of dishonor. * * * *"—citing § 90, T. 39.

### III.

■ A party who claims that the relationship of principal and agent exists, has the burden of proving the agency. Capital Security Co. v. Owen, 196 Ala. 385, 72 So. 8.

Two modes of fastening ostensible authority are usual:

1) One may describe the conduct of the agent as he goes about his master's work; or

2) Acts of the master may imply certain authority.

■ In the first mode of proof, above, some evidence of the master's letting the servant so to act must be adduced. Thus a showing of repeated acts in the presence of the master would rationally imply his permission.

Thus, the first mode is but the obverse of the second.

■ These species of conduct, if significantly unequivocal, can when relied on bind the purported principal. Ratification also can be shown as where the master retains the benefits knowing them to be the product of the servant's endeavors.

In Wood's testimony, we find (using the inferences most favorable to verdict and denial of new trial):

1) Wood was given an estimate of tiling the floor of his "Dairy Dip" stand;

---

3. Code 1940, T. 39, § 4, defines "a reasonable time" quite vaguely.

2) Mays

  a) "came down and gave us a statement or contract on putting down tile on the floor of the Dairy Dip"

  b) "representing" Dixie Floor Sales; and

  c) "drew a contract of what he would do the job for."

3) Wood identified plaintiff's Exhibit 1, dated September 30, 1959, as "a contract where he came down to look at the job and a statement of what he would do it for, and he [Mays] called it a contract; which he wrote on here a contract.";

4) "Dixie Floor Sales" did the job;

5) "We paid Jack Mays";

6) Mays gave Wood a receipt dated "10/12 1959" for $130.00 [this receipt was on a blank form supplied by Wood];

7) As to the performance of this tiling job for his Dairy Dip, Wood, on cross, testified:

"Q He did, I believe, make a contract to do some work for you?

"A Yes, sir.

"Q This was in about thirty days within the time that you cashed these checks for him?

"A Yes, sir.

"Q And then they did the work?

"A Yes.

"Q Did he do the work or did someone else do the work?

"A Well, I guess they had the Dixie Floor Sales truck up there. I seen some men. I suppose they did it. I didn't have time to watch it.

"Q He actually didn't oversee the work, did he?

"A We had him come in and make a few corrections.

"Q I am talking about Jack Mays?

"A Well, that is who I am talking about. He made a few alterations.

"Q Did he approach you on that job or did he ask you to let him do the work?

"A He was a very good customer and we felt that if you will scratch our back we will scratch your back."

8) "About thirty days [after October 12] [Owens] came to [Wood's] store personally [saying with reference to the Dairy Dip job], 'I've got a bill here that needs to be paid.' This is when we produced our receipt."

Plaintiff's Exhibit 1 is incapable of reproduction here in toto because the copy in the record before us has some blurred writing. The original properly has not been sent up.

However, generally, it could be described as a sales slip with the printed heading "Dixie Floor Sales Company." Printed also appear "Sold to" followed in long hand (seemingly Mays's) by "Wood Dairy Dip" with a street address.

The description seems to be, "Installing [illegible] tile in Dairy Dip $130," then follows: "Contract # [by a starlike symbol] 1126."

No further writing appears nor is the slip signed by anyone. At the top is a row with rectangular spaces running horizontally across the top of the sales slip just below the masthead and just above the dateline.

This row runs:

| Sold by | Cash | C.O.D. | Charge | Mdse Ret'd. |
|---------|------|--------|--------|-------------|
|         |      |        |        |             |

In the space "Sold by" appear the initials "J. M." presumably for Jack Mays. Under the word "charge" is an "x."

It does not show any ratification of Mays's act in taking payment for Owens. Indeed, Wood's testimony refutes any imputation that Owens acquiesced in this cash payment to Mays.

Wood never investigated Mays's claim that he (Mays) was "a manager [for Owens] kind of looking after the shop while the boss was out and such as that."

Summarizing, the only contact Wood had with Owens personally was on the occasion of Owens's demanding payment to him (Owens) of the price of the Dairy Dip job.

This does show that Owens had approved Mays's quotation of the price of the job.

Further than such a conclusion, can we say that it was implied that Wood could pay Mays so as to discharge his debt to Owens?

What other and further duties has Wood shown by his evidence that Owens conferred on Mays? We find none other than the self-serving hearsay of Mays describing himself as "a manager."

■ Ordinarily, even when an agent is empowered to make collections for his principal this does not imply authority to indorse checks taken in his principal's name. Anno. 12 A.L.R. 111, 120.

In Brantley v. Southern Life Ins. Co., 53 Ala. 554, we find an agent's purporting to bind his principal (Brantley, a farmer) on a fidelity bond. There was a default by the main obligors. The agent of Brantley to settle signed a note in Brantley's name. Held, non est factum.

The court, per Brickell, C. J., said:

" * * * In a power of attorney, words, however, general, must be construed and limited in subordination to the subject matter. Thus, a general power to draw or indorse promissory notes will not authorize the drawing or indorsing of promissory notes for the mere accommodation of third persons. The authority must be confined and limited to the drawing and indorsing of promissory notes, in matters of business in which the principal has a direct and immediate interest. Wallace v. Br. Bank at Mobile, 1 Ala. [565] 571. A physician, being about to remove from the State, left his books and accounts for professional services with a friend for settlement, giving him general authority to transact all his business in this State. The agent had not authority to assign the accounts, for the indemnity of a surety of the principal. Wood v. McCain, 7 Ala. 800 [42 Am.Dec. 612]. In Scarborough v. Reynolds, 12 Ala. 252, a general authority to transact business was limited to the management and control of a plantation, and declared not to authorize the adjustment of other concerns of the principal.

"The circuit court properly received evidence that the principal, at the execution of the power, had no other occupation or pursuit than that of a farmer, cultivating and renting his lands, and that it was executed in view of a contemplated temporary absence from the State. This evidence was proper, to enable the court to determine the scope of the agency, and to ascertain whether the act in question was within the power conferred. The general expressions of the power must be restrained to the principal business of the party; for it is this which is presumed to have been, and doubtless was, within his contemplation, and which he was willing to submit to the agent. A merchant, about going abroad temporarily, delegated to an agent full and entire authority to sell any of his personal property, or to buy any property for him, or on his account, or to make any contracts, and also to do any acts whatsoever, which he could, if personally present; this general language would be construed to apply only to buying or selling connected

with his ordinary business as a merchant. Story on Agency, § 21. So, this power must be restrained and limited to the ordinary, general business of the principal in the cultivation and renting of his lands, and the duties and transactions it involved. It cannot fairly and properly be extended to other concerns of the principal, which cannot be presumed to have been within his contemplation, and may have required an agent of another character and qualifications to transact."

Here we note no corroboration of Wood's testimony concerning Mays's story of an emergency freight bill. As to the first check, there was no testimony that Mays cashed it in furtherance of managing Owens's business.

In First National Bank of Montgomery v. Montgomery Cotton Mfg. Co., 211 Ala. 551, 101 So. 186, the Cotton Company's bookkeeper deposited a check payable to the company in his personal account using a forged endorsement. His bank was liable for conversion.

The court, per Miller, J., cited §§ 21 and 23 of the 1909 Act (T. 39, §§ 25 and 27) for the following:

" * * * If that indorsement of plaintiff's [the manufacturing company's] name on the check is forged or made without its authority, then it is wholly inoperative, and no title to it passed to the defendant; unless the plaintiff is precluded from setting up the forgery or want of authority. * * * "

The opinion also indicates that carelessness by the employer in allowing an employee, even one formerly dishonest, to handle checks was not such an acquiescence as to metamorphose forgery into valid agency.

A. Paul Goodall Real Estate & Ins. Co. v. North Birmingham American Bank, 225 Ala. 507, 144 So. 7, is a similar case. Cf. Kansas City, M. & B. R. R. Co. v. Ivy Leaf Coal Co., 97 Ala. 705, 12 So. 395.

■ In order to charge the principal because of apparent authority, a third party must prove that the principal manifested indicia of having cloaked the agent with the authority. Restatement, 2d, Agency, § 49.

Negotiable paper calls for the special rules of principal and agent. Thus, Restatement, Second, Agency, § 177, pertinently provides:

"§ 177. Agent Entrusted with Negotiable Instruments

"A disclosed or partially disclosed principal who entrusts an agent with the possession of a negotiable instrument not payable to bearer or endorsed to the agent is not thereby subject to the loss of his interests therein by the collection of the claim or the transfer of the document by the agent."

■ The fact alone of Owens's not having endorsed the paper put Wood on notice to ascertain Mays's specific authority to endorse for Owens. Possession alone of a negotiable instrument neither payable to bearer nor endorsed without restriction is not an indication of authority to discharge the payee's interest. Gentry v. Dugger, 28 Tenn.App. 366, 190 S.W.2d 316.

In Bank of Morganton v. Hay, 143 N.C. 326, 55 S.E. 811, the court states:

"The power to bind the principal by the making or endorsing of negotiable paper is an important one, not lightly to be inferred. It should be conferred directly, unless by necessary implication the duties of the agent cannot be performed without the exercise of the power, or where, as otherwise expressed, the power is practically indispensable to accomplish the object of the agency, and the person dealing with the agent must, subject to the principles heretofore stated, see to it that his authority is adequate. * * * "

See also Mechem, Agency (2d Ed.), §§ 969, et seq.

 No act of ratification was shown. Some notice to the principal would have been required. University Chevrolet Co. v. Bank of Moundville, 25 Ala.App. 506, 150 So. 557.

This opinion can be summarized as applying the rule: "Know your endorser."

It follows that the appellant's motion for new trial should have been granted. The judgment below is

Reversed and remanded.