**SECURITIES AND EXCHANGE COM-
MISSION et al., Plaintiffs,**

v.

**C. H. WAGNER & CO., INC., et al.,
Defendants.**

**Civ. A. No. 72–645–G.**

United States District Court,
D. Massachusetts.

April 8, 1974.

Edward Delaney, Asst. Regional Adm., Securities & Exchange Comm., Boston, Mass., for plaintiffs.

Jeffrey P. Somers, Boston, Mass., for receiver.

Nicholas B. Soutter, Wellesley, Mass., for defendants.

## MEMORANDUM AND ORDER ON CERTAIN CUSTOMER CLAIMS

GARRITY, District Judge.

On November 20, 1972 the court entered an order prescribing the procedure for filing claims and for resolving any disputes as to their validity. Thereafter the court had several hearings on disputed claims, ruling at the time of hearing on some of them and taking under advisement the two groups of claims which are the subject of this memorandum, one relating to letters of credit of Peoples State Savings Bank of Auburn, Michigan, and the other to certificates of deposit of Sharpstown State Bank of Houston, Texas. Basically the dispute concerns construction and interpretation of the Securities Investor Protection Act of 1970 (SIPA), 15 U.S.C. §§ 78aaa–78lll. In addition, the court will rule upon the provability of the claims against the general estate of the debtor under § 63(a)(4) of the Bankruptcy Act, 11 U.S.C. § 103(a)(4).

Before discussing the particulars of the claims at issue, it is essential that the nature of the debtor's business and the general background of these proceedings be explained. The debtor was incorporated in February 1969 for the purpose of acting as a broker-dealer in securities. It had numerous branch offices and effected transactions for customers in mutual funds and over-the-counter securities. It was wholly owned by Clarence H. Wagner and members of his family and was a registered broker-dealer. In March 1970 the Wagners organized Wagner Funding Corp., which invested customers' funds in certificates of deposit and letters of credit issued by banks insured by the Federal Deposit Insurance Corporation (FDIC) and in notes secured by first mortgages on residential real estate. The Funding Corp. had no separate existence from C. H. Wagner & Co., Inc. The raison d'etre of the Funding Corp. was to enable C. H. Wagner & Co., Inc. to avoid its legal duties as a broker-dealer under applicable federal securities laws and regulations with respect to what became a large portion of its business. The Funding Corp. did not register as a broker-dealer under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o, and was accordingly not eligible for membership in the Securities Investor Protection Corporation under § 3(a)(2)(A) of the Securities Investor Protection Act of 1970, 15 U.S.C. § 78ccc. In 1970 C. H. Wagner & Co., Inc. effected transactions in mutual funds and over-the-counter securities with a value approximating $44,000,000 and through the Funding Corp. sold approximately $45,000,000 of bank securities and first mortgages; in 1971 the corresponding figures were approximately $24,000,000 and $27,000,000. By divorcing the Funding Corp. side of the business, the debtor was also able to reduce by approximately one-half the minimum capital requirements of the SEC and the National Association of Security Dealers (NASD). Generally speaking, customers purchasing bank securities and residential first mortgage notes were unaware of the separate existence of the two corporations and for the most part believed that they were doing business with a registered broker-dealer. Accordingly, the trustee on June 23, 1972 petitioned the court for an order adjudicating that the customers of

the Funding Corp. were also customers of the debtor C. H. Wagner & Co., Inc.; and after hearing, and with the approval of SIPC, the court so ordered on July 5, 1972.

The nature of the securities purchased by the debtor's customers whose claims are disputed in these proceedings is as unusual as the relationship between the debtor and its related Funding Corp. The background of the organization of the Funding Corp. in March 1970 was the enactment by Congress in January 1970 of legislation imposing a ceiling on the interest rates which might be paid by savings institutions, including state-chartered banks, whatever their location. Theretofore, savings banks in western sections of the country customarily paid a rate of interest on their deposits one or two percent higher than paid in the northeast section of the country, and many brokers received fees for obtaining the higher interest rates. The debtor, through the Funding Corp., evolved a scheme whereby the legislative ceiling might be avoided and potential investors persuaded that interest rates higher than the maximum legally allowable might be obtained without sacrificing the insurance protection afforded by FDIC insurance. Funding Corp. salesmen operating out of more than 40 branch offices of the debtor located throughout the country sold insured bank certificates of deposit and letters of credit [1] coupled with what they called "bonus interest." Sometimes the bonus was stated in terms of a discount. For example, claimant Robbins purchased an insured letter of credit in the sum of $5,000 from the Peoples Bank; the letter of credit had a two-year term and paid legal interest quarterly at the rate of 7% per annum; but when Robbins'

money was forwarded by the debtor to the Michigan bank, the debtor sent him a check of its own in the sum of $100, which was designated a 1% per annum discount ($50 for each year of the two-year term). Actually the "bonus interest" was not interest at all in the sense of payment for the use of money by the party issuing the letter of credit. Rather it was a part of the commission received by the debtor from a third party, viz., the borrower from the bank to whom the bank by prearrangement loaned Robbins money. The scheme involved the debtor's, whether with or without a bank's cooperation did not appear, locating a substandard potential borrower willing to pay higher than normal interest rates, e. g., a real estate speculator or underfinanced housing developer. It would be agreed among the debtor and the potential borrower and the bank that, if the debtor arranged for the deposit in the bank of the sum which the developer wished to borrow, the bank would loan the money deposited by the debtor to the particular substandard borrower, who would pay a substantial commission or finder's fee to the debtor. The portion of the commission paid by the debtor to its customer was called the "bonus interest" or "discount" and, with respect to the Peoples Bank and Sharpstown Bank securities currently in question, was paid by the debtor to the customer upon consummation of the tripartite transaction.[2] The Peoples Bank transaction currently at issue found the debtor depositing $255,000 which it had solicited from its customers, which the bank immediately loaned indirectly to a Florida real estate developer and for which it effectively issued its letters of credit to the debtor's customers in the amounts contributed by

---

1. These are the only types of securities forming the basis of claims currently at issue. Claims based upon notes secured by first mortgages on residential real estate were heard separately and determined on September 10, 1973.

2. In many other instances the debtor agreed with its customer that the bonus interest or

discount would be paid by the debtor to the customer at the time of the final payment due on the bank's obligation, described in the debtor's forms as "on maturity." Claims against the debtor for this type of bonus interest were the subject of a different hearing and an order of the court dated October 5, 1973.

them. The bank's letters of credit were issued "effectively" but not actually because within a month after the $255,000 was transmitted by the debtor to the Peoples Bank, the Michigan banking authorities placed it in receivership. The debtor's customers, 21 of whom have objected to the trustee's disallowance of their claims in these proceedings, received their bonus interest payments from the debtor but nothing more.[3] Thus arises their contention that the debtor did not arrange for the delivery to them of the securities which they purchased and their losses of their investments are covered by SIPA and the amounts of their investments should under SIPA be advanced by SIPC to the trustee for payment to them.

The Sharpstown Bank situation is similar but different in some respects. The securities there were certificates of deposit rather than letters of credit and were actually issued by the bank and received by claimant customers before the bank's insolvency was discovered and the bank taken over by the banking authorities of the State of Texas. Only four customers filed objections to the trustee's disposition of their claims and but two of them challenge his determination that SIPA does not apply. Two customers, federal credit unions, which each purchased a $100,000 certificate of deposit, concede that SIPA is inapplicable but urge that claims in such amounts be recognized against the general estate of the debtor, a contention opposed by the trustee.[4] The basis of the other two customers' claims is that the debtor sold them certificates of deposit in excess of the $20,000 per account limit of FDIC insurance then in effect. As to such excess, the customers have received a dividend of only approximately 30% and may lose about 70% of their deposits made in excess of the $20,000 limit.

■ The legal nature of the customers' investments was discussed and determined in a federal court previous to the commencement of the instant proceedings in Safeway Portland Employees' Federal Credit Union v. C. H. Wagner & Co., Inc. et al., D.Or., 1971, 335 F.Supp. 116. Plaintiff in that case was an employees' credit union which bought a $250,000 certificate of deposit in the Sharpstown Bank and sued the debtor company under § 12 of the Securities Act of 1933, 15 U.S.C. § 77*l* for having engaged in a scheme to sell unregistered investment contracts in violation of § 5(a) of the same Act, 15 U.S. C. § 77e(a). The debtor company defended mainly on the ground that the Sharpstown Bank certificates of deposit were exempt securities under 15 U.S.C. § 77c(a)(2) and that therefore there was no need to register them and sections 5(a) and 12 of the Securities Act

---

3. Actually the 21 claimants whose investments were placed in the Peoples Bank may receive dividends from the FDIC. One of them brought suit on May 22, 1970 in the Circuit Court for Bay County in Bay City, Michigan, entitled Sullivan et al. v. Federal Deposit Insurance Corp., Civil Action No. 6076–T. There the court ruled that the case would proceed as a class action and ruled that the investors' claims were covered by federal insurance and would be paid in full. However, an appeal is now pending in the state courts of Michigan in which the bank's shareholders are appealing from the lower court's ruling on the ground that the $255,000 was never truly deposited in the bank but rather was diverted to the Florida land developer by unauthorized and ultra vires acts of certain bank officers. For purposes of the instant proceedings under SIPA, we treat the 21 customer claims on the hypothesis that the appeal will succeed and that they will recover nothing in the Michigan proceedings.

4. Previous to the institution of the instant proceedings, both credit unions brought suit in this district against the debtor and some of its officers: Swank Federal Credit Union v. C. H. Wagner & Co., Inc. et al., C.A. No. 71–2038–T, and Somerville School Employees' Federal Credit Union v. C. H. Wagner & Co., Inc. et al., C.A. No. 71–2618–T. To the extent that these actions assert claims against defendants for whom a receiver or trustee has been appointed in the instant proceedings, their prosecution has been enjoined. However, there are individual defendants in both cases who are not parties to the instant proceedings and, as against them, the actions may be maintained.

of 1933 were inapplicable. Generally, any security issued or guaranteed by any bank is exempt. However, the court held that the inclusion of the bonus interest or discount in the package sold by the debtor to its customer made it an investment contract within the definition of the term "security" in § 2 of the Act, stating at 118,

> I do not believe that the Wagner scheme is separable for purposes of legislation or exemption under the Act. The defendant-brokers solicit both the certificate purchasers and persons desirous of obtaining loans from the bank. The entire scheme is integrated. The bank and its deposits are at the center of the scheme. The bank's borrower takes the money out as fast as Wagner's investors send it in.

The court quoted the definition of an investment contract in S.E.C. v. W. J. Howey Co., 1946, 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244, as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." The court held that the debtor company was liable under sections 5(a) and 12 of the Act for the full amount of the certificate of deposit plus the bonus interest or discount, which in that case was not due until maturity. Thus in the instant case we proceed on the basis that the debtor's customers purchased investment contracts. Cf. Lennerth v. Mendenhall, N. D. Ohio 1964, 234 F.Supp. 59, 63.

■ Turning to the validity of the customers' claims at issue in these proceedings, the controlling provisions appear in § 6 of SIPA, 15 U.S.C. § 78fff, especially the definition of "net equity" of a customer's account as defined in subsection (c)(2)(A)(iv) and the description of the single and separate fund in subsection (c)(2)(B) and the trustee's obligation to complete open contractual commitments stated in subsection (d). Upon consideration of memoranda filed by the parties, and argu-

ments made at the hearing, we find that the customers' investments in the letters of credit and certificates of deposit of the Peoples Bank and the Sharpstown Bank are not includable in their "net equity" and affirm the trustee's disallowance of their claims. On the further question whether these claims may be proved against the debtor's general estate, we disagree with the trustee and rule that they may be so proved and allowed.

■ The intent of Congress in enacting SIPA, as shown by the legislative history and the provisions of the statute, was in our opinion to protect investors against losses caused by the insolvency of broker-dealers and not by the insolvency of the companies in which their funds have been invested. "The primary purpose [of the Act] . . . is to provide protection for investors if the broker-dealer with whom they are dealing encounters financial troubles." Code Cong. & Admin.News 1970, p. 5254. This is shown by the provisions of § 5(a)(2) and (b) of the Act, 15 U.S.C. § 78eee, which fix the standards for action by SIPC and court action in terms of a broker member being in danger of failing to meet its obligations to customers and a member's insolvency, commission of an act of bankruptcy, or the like.

■ Also, the customer claims here at issue do not fall within the specific provisions of § 6 of the statute, 15 U.S. C. § 78fff, which govern liquidation proceedings. Subsection (g) providing for payments to customers relates the trustee's duty to their having "net equities" as defined in subsection (c)(2)(A)(iv) to mean the dollar amount of their accounts determined by giving effect to open contractual commitments completed as provided in subsection (d). The latter subsection provides, "The trustee shall complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of the debtor's business and which were outstanding on the filing date—." It should be noted first that the commitments referred to are

those "of the debtor" and "which were outstanding on the filing date." There was no such open contractual commitment of the debtor in this case regarding the Peoples Bank letters of credit as to which it had carried out its customers' instructions. All that remained to be done was for the Bank to forward its letters of credit directly to the customers. The provisions of § 6 are obviously designed for the protection of customers trading in readily marketable securities such as stocks and bonds. The ordinary course of a broker's business in handling such transactions requires that the customer pay the broker for securities purchased within five days after the date of the transaction; should the security be in nondeliverable form on that date, as often happens, the broker holds the customer's funds until delivery of the securities, which may not occur until after several days or even weeks. It is this type of open contractual commitment which the SIPC trustee is obliged to complete and to which he must give effect in determining a customer's net equity. Where no further action need be taken by the debtor, there is generally no open commitment within the meaning of the Act. This construction is supported by SIPC rule S6d–1(a)(3) adopted July 5, 1973, 2 CCH Federal Securities Law Reporter ¶ 26,668, providing "that the term open contractual commitment shall not include any contractual commitment for which the security which is the subject of the trading had not been issued by the issuer as of the trading date." Regarding the Sharpstown Bank certificates of deposit, no transactions were outstanding as to them on the filing date; on the contrary, the certificates had already been delivered by the bank to the claimant customers.

Subsequent to the hearing on the claims now in issue, the Court of Appeals for the Third Circuit decided S. E. C. v. Aberdeen Securities Co., Inc. et al., 3 Cir. 1973, 480 F.2d 1121, in which the liquidation provisions of SIPA were discussed and one of the claims ruled upon, by petitioners named Raizes, had a surface similarity to the claims here presented. There the SIPC debtor received $500 from the Raizes to purchase 100 shares of a prospective new issue of Boatland, Inc.; the debtor transmitted the funds to another broker-dealer which was underwriting the Boatland offering; the transaction was not completed because the stock was never issued and both Boatland, Inc. and the broker-underwriter went into bankruptcy and a trustee for Aberdeen Securities Co. was appointed under SIPA. The Court of Appeals ruled as follows:

> Thus, if under the local law or by virtue of regulations under which it operated, the debtor was obligated to refund the $500 to the Raizes because of inability to deliver the Boatland stock, then there would be a claim for cash properly included in the term "net equity."

> Since the record does not contain sufficient facts upon which we can rule, we remand to the District Court for appropriate findings in order to determine if there was, on the filing date, a legally sufficient claim by the Raizes against the debtor because of an obligation to return the money which had been made available to Aberdeen for purchase of a nonexistent stock.

The factual distinctions between the Raizes' claim and those here at issue are evident: (a) neither the Peoples Bank letters of credit nor the Sharpstown Bank certificates of deposit were nonexistent in the same sense as the Boatland, Inc. stock, which was never issued; and (b) the Raizes' investment was forwarded by the debtor to another broker-dealer and, at least from the latter's standpoint, an open contractual commitment within the meaning of SIPA was outstanding on the filing date.[5] Wheth-

---

5. The opinion of the Court of Appeals in the Aberdeen Securities Co., Inc. case was dated June 28, 1973 and SIPC rule S6d–1(a)(3), quoted ante, was adopted on July 5, 1973. Whether the authority of the decision, with respect to the Raizes' claim, was undermined by enactment of the rule is a question we do not reach.

er the Raizes succeeded in proving a legally sufficient claim against the debtor does not, of course, appear in the appellate court's opinion. The legal sufficiency of their claim was held to depend upon whether the debtor was under an obligation to return their $500 to them. In construing the term "net equity" as used in SIPA, the Court of Appeals stated, "We have no doubt, however, that the 'dollar amount' of a customer's account includes his cash which the broker has, or should have, been holding." Thus, on remand it was open to the Raizes to show that Aberdeen Co. should have been holding their $500 on the filing date; perhaps Aberdeen, either by customary practice or specific agreement with the customers, should not have forwarded their money to the underwriting broker until the prospective new securities had been issued and delivered. In the instant case the claimant customers' instructions to the debtor could be carried out only by transmitting their funds to the Michigan and Texas banks.

■■ Provisions of the Bankruptcy Act are incorporated by reference in SIPA with respect to liquidation of the debtor's general estate. 15 U.S.C. § 78fff(e). Provability of claims against the debtor's general estate is governed by § 63(a) of the Bankruptcy Act, 11 U.S.C. § 103(a), which provides for proof of claims founded upon " . . . (4) an open account, or a contract express or implied;". The trustee, relying upon the established rule that tort claims generally are not provable in bankruptcy, 3A Collier on Bankruptcy (14th ed. 1973) § 63.25, has taken the position that the claims of customers whose funds were transmitted to the Peoples Bank and Sharpstown Bank sound in tort and should therefore be disallowed. True, some claims are couched explicitly in terms of deceit and misrepresentations by debtor's salesmen with whom the claimants did business. However, characterization should not control. All of the claims are at minimum quasi-contractual and "A liability upon quasi contract is one upon an 'implied contract,' and so provable in bankruptcy." Brown v. O'Keefe, 1937, 300 U.S. 598, 607, 57 S.Ct. 543, 548, 81 L.Ed. 827. It was held in Safeway Portland Employees' Federal Credit Union v. C. H. Wagner & Co., Inc., *supra*, that the debtor's customers had causes of action under §§ 5(a) and 12 of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77*l*. It would be odd if customers' rights under the Securities Act could be defeated by the offending broker's embracing the remedies of the Bankruptcy Act. Legislation of a particular legislative body should not be construed, absent an intent to repeal, such that benefits conferred by one statute are taken away by another. Quasi-contractual liability may be purely statutory. Collier on Bankruptcy, *id.*, § 63.24, 1889–1890.

Additionally, several of these claims against the general estate need not rest upon the quasi-contract fiction because based upon express contracts and contracts implied in fact. For example, the debtor allegedly entered into a separate agreement with Swank Federal Credit Union, evidenced in writing, that it would refund its funds amounting to $100,000 upon demand; and claimant Reiser typically asserts a specific promise by the debtor to make delivery to him of Peoples Bank letters of credit. Such assertions are generally consistent with evidence received by this court at various hearings in the course of these protracted proceedings. There is no need, however, to discuss the particulars of each claim against the general estate at this juncture, in view of the court's conclusion that all of them are provable as quasi-contracts of the debtor.[6]

---

6. Provability is, of course, to be distinguished from allowability and we do not rule upon the latter point at this time. Whether there will be a general estate available for partial satisfaction of the claims of general creditors will depend mainly on the outcome of litigation recently instituted by the trustee in this court, Carens, Trustee v. J. C. Trahan, C.A. 74–619–M, seeking the return of securities which he alleges were fraudu-

For the foregoing reasons it is ordered that the customers' objections to the trustee's disallowance of their claims arising from purchases of letters of credit of Peoples Bank and certificates of deposit of Sharpstown Bank be overruled and the trustee's disposition of these claims be approved and adopted, except that losses of such investors which are unsatisfied in pending state court receivership proceedings in Michigan and Texas may be proved as claims against the debtor's general estate.

lently or preferentially transferred by the debtor, and secondarily on the size of

SIPC's priority claim for reimbursement of administrative expenses.