**In the Matter of Lammot duPont Copeland, Jr., Debtor.**

**Lammot duPont COPELAND, Jr., Debtor-in-Possession, Plaintiff,**

v.

**EMROY INVESTORS, LTD., et al., Defendants.**

**No. BK 70–94.**

United States District Court, D. Delaware.

April 14, 1977.

On Rehearing Sept. 9, 1977.

E. Norman Veasey, Robert H. Richards, III, and Richard G. Elliott, Jr., of Richards, Layton & Finger, Wilmington, Del., for debtor-plaintiff.

Aubrey B. Lank and Steven D. Goldberg of Theisen, Lank & Mulford, Wilmington, Del., of counsel, Barry H. Singer of Lowenthal, Freedman, Landau, Fischer & Singer, P.C., New York City, for defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This matter presents an interface of the Federal Bankruptcy Act with the federal securities law; raising the unassuming yet vexing question of whether claims in a private damages action brought pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder; and New York General Business Law § 352–c (McKinney 1968), are provable in bankruptcy. A statement of the salient facts is essential to an understanding of the resolution of this issue.

The parties to this controversy presently are adversaries in two separate court proceedings, only one of which is before this Court. In the first action, Emroy Investors, Ltd. ("Emroy"), Edna Mae Fadem, Patricia T. Raizen and Roy Raizen, individually ("the individual defendants") and as Executors of the Estate of Charles S. Raizen, Deceased ("the Estate"), have filed suit against Lammot duPont Copeland, Jr. ("Copeland"), in the Southern District of New York on a cause of action arising under section 10(b) and Rule 10b–5 and New York state statutory law. In the proceeding presently before this Court,[1] Copeland has filed suit against the above enumerated parties, along with their New York counsel, Barry Singer, Esquire (collectively "the defendants"), contending, inter alia, that the securities fraud claim raised in the New York law suit is founded upon a claim provable in bankruptcy, and as a consequence the New York action is barred by a November 12, 1974, Order Confirming Plan of Arrangement under Chapter XI of the Bankruptcy Act. Copeland additionally claims that defendants, by pursuing this matter, are in contempt of the injunction contained in that confirmation Order which enjoined "[a]ll creditors whose debts are discharged by this order . . . from instituting or continuing any action or employing any process to collect such debts as personal liabilities of Debtor [Copeland]."[2]

The transaction which brought these parties to the courthouse steps both here and in New York involves the sale of controlling interest of Transogram Company, Inc. ("Transogram"), a company whose stock was traded on the American Stock Exchange. In 1967 Transogram suffered dual setbacks in the form of the death of Charles Raizen, its Chairman of the Board and Chief Executive Officer, and the beginning of severe and continuing financial losses which eventually would deplete its capital.

By the fall of 1968, four banks[3] to whom Transogram was indebted were becoming increasingly uneasy about their outstanding Transogram loans. At or about the same time, Roy Raizen ("Raizen") and Leroy Fadem ("Fadem"), son and son-in-law of the deceased Charles Raizen, who then were heading the Transogram operation, began talking with Thomas A. Shaheen ("Shaheen") with an eye toward resolution of Transogram's mounting financial difficul-

---

1. Previous reported decisions regarding other aspects of the Copeland Chapter XI proceeding are *In re Copeland,* 412 F.Supp. 949 (D.Del. 1976); *In re Copeland,* 391 F.Supp. 134 (D.Del. 1975); *In re Copeland,* 388 F.Supp. 1280 (D.Del.1974), aff'd 517 F.2d 1397 (3d Cir. 1975); *In re Copeland,* 350 F.Supp. 943 (D.Del.1972).

2. Docket No. 1392, Exhibit C—Order Confirming Plan of Arrangement at 4.

3. The four banks were Bankers Trust Company, Chase Manhattan Bank, N. A., Manufacturers Hanover Trust Company and Provident National Bank.

ties. Eventually, Shaheen revealed that he represented Copeland and indicated that Copeland would be interested in acquiring control of Transogram through a company which Copeland allegedly controlled, Winthrop Lawrence Corporation[4] ("Winthrop Lawrence"). The negotiations progressed, fueled by the mounting financial pressure applied by the banks against Transogram. An agreement in principle was signed in February 1969, which would eventually lead to the transfer of control of Transogram from Emroy and the Raizen Estate to Winthrop Lawrence.

The agreement in principle provided that Emroy and the Estate agreed to sell 750,000[5] shares of the common capital stock of Transogram to Winthrop Lawrence at the agreed purchase price of $6.00 per share.[6] The purchase price was payable $500,000 down with the balance to be paid over a seven year period, with the Winthrop Lawrence notes secured by Copeland's personal guarantee. Although the agreement in principle was signed on February 14, 1969, because of difficulties that need not be detailed, the actual stock transfer was not to be consummated for another eight months.

In October, all difficulties were resolved with Emroy and the Estate agreeing, *inter alia,* to deliver to the four banks as collateral the entire down payment of $500,000 which they were to receive from Winthrop Lawrence for the sale of their stock, together with the notes of Winthrop Lawrence which they were to receive for their shares of Transogram, and Copeland's personal

guarantee of the Winthrop Lawrence notes.[7] On October 29, 1969, the sale of control of Transogram to Winthrop Lawrence was finally consummated. However, the financial status of Transogram did not improve, and as a result, Transogram defaulted on its debt to the banks.

On October 20, 1970, Copeland filed a Petition for Arrangement under Section 322 of Chapter XI of the Bankruptcy Act, 11 U.S.C. § 722, in the District of Delaware. Thereafter, proofs of claim were filed by the Estate and Emroy on the Copeland guarantee, notwithstanding their prior assignment of the guarantee to the four banks.[8] A short time later the four banks to which Transogram still owed outstanding liabilities also filed proofs of claim against the debtor on the guarantee. On July 7, 1972, Copeland filed a motion for summary judgment on the claims filed by the Estate and Emroy, on the ground that the guarantee had been assigned. Subsequently, the then Referee in Bankruptcy entered orders granting Copeland's motion for summary judgment and dismissed the two claims with prejudice. These orders each bear a notation by counsel for the Estate and Emroy that neither objected to the entry of the order.

After hearing on notice,[9] a Plan of Arrangement was approved by the Court on November 12, 1974, in accordance with which the debtor received a discharge of all provable debts, except those to which an objection to dischargeability of debt had been filed.[10] While the four banks objected

4. Based upon what is in the mammoth file jacket of the Copeland Chapter XI proceeding, Copeland actually owned either 37½% or 50% of Winthrop Lawrence. Shaheen through an entity he controlled owned a share of Winthrop Lawrence equal to that of Copeland.

5. The Estate contributed 652,447 shares, and the remaining 97,553 shares came from Emroy.

6. Transogram shares were trading on the American Stock Exchange at about $19.50 per share at this time; however, the shares transferred to Winthrop Lawrence were not registered shares.

7. The $500,000 down payment, Winthrop Lawrence notes and Copeland guarantee passed to the control of the banks on December 15, 1969.

8. The purported rationale for filing the claim was the "contingent interest" they held in the guarantee, should the money owed to the banks by Transogram be paid in full.

9. For reasons not clear of record, a copy of the notice which included the Plan of Arrangement was sent to at least one of the Executors of the Estate and counsel for the Estate and Emroy.

10. All dischargeability of debt litigation has now either been disposed of or is in the process of settlement, leaving the instant motion as the only significant unresolved litigation.

to the dischargeability of their debt, they later reached a court-approved settlement with the debtor resulting in discharge of the debt.[11]

On October 24, 1975, the Estate, Emroy and individual defendants filed a three count amended complaint[12] ("the New York complaint") in the Southern District of New York. Jurisdiction was based on the Securities Exchange Act of 1934[13] and "the principle of pendent jurisdiction."

The first claim ("Claim 1") for relief is under Rule 10b–5 and is on behalf of the Estate and Emroy who claimed they had been defrauded by Copeland in a transaction involving the sale of Transogram stock to Winthrop Lawrence. Specifically, they contended that there had been material misrepresentations and omissions contained in Copeland's financial statement; that Copeland misrepresented that he was in a financial position to honor his personal guarantee; that Winthrop Lawrence was his personal holding company and that it was of sound financial status; and finally that Copeland had fraudulently concealed from them that his personal representative, Thomas A. Shaheen, who also controlled a substantial share of Winthrop Lawrence, was under investigation by the Department of Labor for allegedly embezzling funds of the International Barber's Union.[14]

The second claim ("Claim 2"), also under Rule 10b–5, is titled as being on behalf of the individual New York defendants[15] (who are also executors of the Estate) and incorporates by reference all the substantive paragraphs contained in the first claim for relief. It then goes on to state that Copeland:

"fraudulently induced plaintiffs, Edna Mae R. Fadem and Roy R. Raizen, to agree on behalf of the Estate and Emroy to the transfer of control of Transogram to Shaheen, Winthrop Lawrence and defendant and to vote all of the shares of the Estate and Emroy and all of their shares, including 152,900 shares held individually by plaintiffs Edna Mae R. Fadem, Patricia T. Raizen and Roy R. Raizen, and 60,800 shares retained by Emroy, in approval of the said plan of reorganization. Without the said shareholder approval the said plan of reorganization could never have been consummated." New York Complaint, ¶ 18.

Thereafter, it alleges that as a result of Copeland's acts the Transogram stock of the individual defendants and that still held by Emroy was rendered worthless. The third claim ("Claim 3") for relief, based upon Section 352–c of the General Business Law of the State of New York, incorporates by reference the substantive paragraphs of the first two claims.

Approximately a month following the filing of the complaint in New York, Copeland filed a complaint with this Court claiming that any liability owing to the defendants had been discharged by the Order of November 12, 1974, discharging his provable debts. Copeland now seeks (1) an injunction preventing them from proceeding further with the New York action or instituting any litigation against him concerning any matter in the Proceedings for an Arrangement; (2) that defendants be held in contempt of the Court's Order Confirming Plan of Arrangement and accompanying injunction; and (3) that his counsel be awarded attorneys' fees. Copeland's Motion for

11. The settlement with the four banks was approved on November 14, 1975, after the discharge had been granted and after the present litigation commenced. The record contains no indication of when the settlement papers were signed.

12. The initial complaint was filed on September 29, 1975. Its contents are of no relevance to this proceeding.

13. 15 U.S.C. § 78a.

14. Shaheen was eventually indicted on the charges and fled the country to avoid prosecution.

15. The descriptive title of the second claim for relief is at a variance with the relief actually sought to the extent that it omits reference to monetary damages suffered by Emroy.

Partial Summary Judgment has now brought the matter to a head.[16]

### The Tort/Contract Dichotomy
### Under Section 63a(4)

The starting point for any analysis must be whether the claims asserted in the New York action are provable claims under the Bankruptcy Act; for, unless a claim is provable, it is not dischargeable under the Bankruptcy Act.[17] 1A *Collier, Bankruptcy* ¶ 17.15 at 1628.2 (14th ed.). Section 63 is the only section of the Bankruptcy Act which defines provable debts. 3A *Collier, Bankruptcy* ¶ 63.02 at 1762 (14th ed.).[18]

The parties are in agreement that the question of provability of defendants' securities fraud claims is governed by the applicability of section 63a(4) of the Bankruptcy Act, 11 U.S.C. § 103a(4): "Debts of the bankrupt may be proved and allowed against his estate which are founded upon . . . (4) an open account, or a contract express or implied[.]" The debtor contends that the securities fraud claim is a debt founded upon an express or implied contract, and for this reason was provable in bankruptcy. The defendants disagree with this characterization, arguing instead that their securities fraud claim is a "pure tort" claim, which is not provable in bankruptcy.[19]

The parties' disagreement centers on what best can be described as the "tort/contract dichotomy." Debts founded upon express and implied contracts are made provable by operation of section 63a(4). On the other hand, claims based on tort are ordinarily not provable in bankruptcy. "The reason for this traditional principle is historical rather than rational. It governed and continues to govern the English bankruptcy law, and may be due to the fact that bankruptcy law was in its origin a proceeding devised primarily for the purpose of liquidating commercial transactions. . . . [Thus] unless a claim *ex delicto* can be said to come under one of the recognized exceptions [to this rule], it is under the present

---

16. Defendants in their brief contend they are entitled to summary judgment as well. *See* Def. Brief at 1–2. Thus, in effect, the Court has before it cross-motions for summary judgment. *See* 6 *Moore, Federal Practice* ¶ 56.12.

17. At least one author asserts provability can be established in the bankruptcy court as part *of a determination of dischargeability apart from a contempt proceeding. See* Countryman, The New Dischargeability Law, 45 *Am. Bankr.L.J.* 1, 30 (Winter 1971), which notes that section 17c(1), 11 U.S.C. § 35c(1), provides that: "c. (1) The bankrupt or any creditor may file an application with the court for the determination of the dischargeability of *any* debt." (Emphasis added.) The author then states:

"It should be noted also that § 17c(1), unlike § 17c(2), is not confined to questions of dischargeability under one or more of the specific exceptions listed in § 17a. Hence, either party may under § 17c(1) apply to the bankruptcy court for a determination of dischargeability with respect to a debt which the creditor contends, or may contend, is not dischargeable because (1) not provable or (2) scheduled in a prior proceeding in which no *discharge was granted and which is taken to bar dischargeability in a later proceeding under the doctrine of res judicata.*"

In the instant matter, neither Copeland nor defendants have adopted the Countryman position. Copeland has expressly disavowed any use of § 17c(1) (Doc. No. 1494, pp. 12–13) as the mechanism for determining whether the New York claims are provable within the meaning of section 63.

18. Copeland argues that because his alleged misconduct fits squarely within the statutory confines of section 17(a)(2), 11 U.S.C. § 35a(2), defendants *a fortiori* had a provable claim (Copeland's Reply Brief at 16). While superficially appealing, the position is untenable since section 17 does not purport to enlarge the section 63 definition of provable claims. Section 17a only becomes operative to prevent discharge of certain provable claims. Copeland's theory of provability based on section 17 is completely undermined when one realizes it is possible to have provable and non-provable claims which could satisfy the literal definition of non-dischargeable debts within the meaning of section 17. *Cf. In re Crimmins*, 406 F.Supp. 282, 284–85 (S.D.N.Y.1975).

19. Defendants in their answer assert as an affirmative defense that the Court lacks personal jurisdiction over them. Docket No. 1421, Answer to Complaint, ¶ 26. Defendants apparently abandoned and have thereby waived this objection in their brief, by presenting therein their own motion for summary judgment. *Cf. Fairhope Fabrics, Inc. v. Mohawk Carpet Mills*, 140 F.Supp. 313 (D.Mass.1956).

law not probable." 3A *Collier, Bankruptcy* ¶ 63.25[1] at 1891–92 (14th ed.).[20]

Although historically grounded in the bankruptcy laws, the vitality of the tort/contract dichotomy over time has been eroded both judicially[21] and legislatively.[22]

This erosion began in *Crawford v. Burke*, 195 U.S. 176, 25 S.Ct. 9, 49 L.Ed. 147 (1904), where the Supreme Court squarely addressed the situation in which a claim could support either a tort or contract action. The Court acknowledged that the literal language of section 63a(4) of the Bankruptcy Act[23] standing alone might support the conclusion that a claim for conversion of property would not be a provable claim, if the plaintiff "elected to treat the conversion as fraudulent and sue in trover, though he might have chosen to waive the tort and bring an action for a balance due on account." 195 U.S. at 193, 25 S.Ct. at 13. But convinced that a creditor should not be permitted to circumvent a discharge in bankruptcy through an election of remedies by which he could forego his contract action in order to preserve the tort action, the Court concluded that any claim sounding in contract was provable in bankruptcy, notwithstanding that the same claim might also sound in tort; and accordingly, if not proved in bankruptcy, would be barred by the discharge.

"[I]f a debt originates or is 'founded upon an open account or upon a contract, express or implied,' it is provable against the bankrupt's estate, though his creditor may elect to bring his action in trover as for fraudulent conversion, instead of assumpsit for a balance due on an open account. . . . [A]ll debts originating upon an open account or upon a contract, express or implied, are provable, though plaintiff [elected] to bring his action in fraud." 195 U.S. at 193, 25 S.Ct. at 13.

The debt in *Crawford* was provable because it originated or was founded upon an express contract. Further erosion of the tort/contract dichotomy has resulted from the broad reading given the "implied contract" language contained in section 63a(4), such that even contracts implied in law (quasi-contracts) fall within the purview of section 63a(4).[24] Since a large number of torts can support a quasi-contractual claim or a claim for unjust enrichment as well as one for damages in tort, they have been deemed provable in bankruptcy. "In these cases, such as fraud in the inducement, or conversion of property, the provable claim is founded neither upon an express contract nor upon a contract implied in fact only. The basis is a contract implied in law, and

**20.** *See Schall v. Camors*, 251 U.S. 239, 250, 40 S.Ct. 135, 136, 64 L.Ed. 247 (1920) ("Historically, bankruptcy laws, both in England and this country, have dealt with the concerns of traders. Our earlier bankruptcy acts invariably have been regarded as excluding from consideration unliquidated claims arising purely ex delicto.").

**21.** A prime factor contributing to judicial erosion has been adherence to the principle that doubts should be resolved in favor of provability. *See Maynard v. Elliott*, 283 U.S. 273, 51 S.Ct. 390, 75 L.Ed. 1028 (1931); *Williams v. United States Fidelity & Guaranty Co.*, 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915). *Compare Goldsmith v. Overseas Scientific Corp.*, 188 F.Supp. 530 (S.D.N.Y.1960); *In re Paramount Publix Corp.*, 8 F.Supp. 644 (S.D.N.Y. 1934).

**22.** An example of legislative erosion is Section 63a(7), 11 U.S.C. § 103a(7), of the Bankruptcy Act which makes liabilities for "the right to recover damages in any action for negligence

instituted prior to and pending at the time of the filing of the petition in bankruptcy" a provable debt.

Further evidence of legislative erosion can be viewed in the exceptions to dischargeability contained in section 17a of the Bankruptcy Act, where a number of intentional torts are exempted from discharge, suggesting by inference that Congress in some circumstances deemed these claims to be provable under section 63. Compare the outcome of Claim 1, *infra*, and the possible objection of nondischargeability under section 17a(4), 11 U.S.C. § 35a(4).

**23.** *Crawford v. Burke* was decided in the context of the Bankruptcy Act of 1898; however, section 63a(4) has undergone no change in subsequent enactments.

**24.** Contracts implied in fact have also been deemed to fall within the scope of section 63a(4). *See* 3A *Collier, Bankruptcy* ¶ 63.24 at 1887 (14th ed.).

the theory on which the law implies such a contract by way of a mere fiction is the enrichment that the tortfeasor derived from his wrong, and that, in conscience, he should restore to the injured party." 3A *Collier, Bankruptcy,* ¶ 63.25[2] at 1894 (14th ed).

■ Most fraud claims result in the unjust enrichment of the tortfeasor, and accordingly are provable, but this is not a foregone conclusion. If a situation occurs in which the fiction of unjust enrichment is not appropriate, then courts have refused to hold such fraud claims provable. *See, e. g., Schall v. Camors,* 251 U.S. 239, 40 S.Ct. 135, 64 L.Ed. 247 (1920); *In re Neve Drug Stores,* 48 F.2d 693 (2d Cir. 1931); *In re Crimmins,* 406 F.Supp. 282 (S.D.N.Y.1975); *In re Sussman,* 88 F.Supp. 230 (S.D.N.Y. 1950).

With this background in mind, the Court can now address the merits of the parties' various claims.

### Provability of Defendants' Securities Fraud Claims

The debtor contends that the three claims contained in the New York complaint are provable because each is founded upon all three types of contracts enumerated in section 63a(4), although each need be based in fact only on any one of the three to be a provable claim. First they are debts founded upon an express contract—the written agreement effectuating the stock transfer from the Estate and Emroy to Winthrop Lawrence, in return for the Winthrop Lawrence notes and the Copeland guarantee. Second, they are debts founded upon a contract implied in fact—the promise that material representations of the debtor in connection with the express contract were true. Third, they are debts founded upon a contract implied in law—the quasi-contract preventing unjust enrichment of the debtor for his alleged wrongdoing in perpetrating a fraud. In analyzing these contentions, the Court will address separately each of the three claims contained in the New York complaint.

### Claim 1—The Claim of the Estate and Emroy for Relief in the New York Action

Copeland initially contends that Claim 1 of the New York amended complaint, alleging a violation of Rule 10b–5 is founded upon an express contract. He further urges that but for the default by Winthrop Lawrence in payment of the notes collateralized by the Copeland guarantee, there would be no Claim 1 of the New York complaint.

■ Two considerations compel a holding that Claim 1 of the New York complaint is based upon an express contract and therefore constitutes a provable claim within the meaning of section 63a(4) of the Bankruptcy Act. First, the guarantee constituted an express contract between Emroy and the Estate and Copeland. Emroy and the Estate desired to create an express contractual relationship between themselves and Copeland, in the event that Winthrop Lawrence defaulted on the payments on its notes. Of paramount importance is the fact that the contractual guarantee was *specifically required by Emroy and the Estate* as a condition for their agreement to selling controlling interest in Transogram to Winthrop Lawrence. Absent the guarantee, there would have been no sale of Transogram stock. This unassailable fact is expressly set forth in the guarantee:

> "WHEREAS, the Sellers have refused to enter into said Contract of Sale and accept the promissory Notes of the Buyer unless the Undersigned [Copeland] would guarantee the prompt and punctual payment of said promissory Notes of $4,000,-000 and interest thereon . . . ."

In light of this provision in the guarantee, Emroy and the Estate cannot now be heard to complain it did not create an express contractual obligation on the part of Copeland, so as to require the resulting debt to

be timely filed in the Chapter XI proceeding, or be barred.[25]

Second, Emroy's and the Estate's 10b–5 claim contained in Claim 1 of the New York amended complaint is founded upon the guarantee. The injury resulting from Emroy and the Estate's claim on the guarantee is the same injury that resulted from the alleged 10b–5 violation contained in Claim 1. The nature of the latter injury is spelled out in Paragraphs 14 and 15 of the New York complaint, and makes clear that the two injuries are identical:

"14. Subsequent to the consummation of the said sale, Winthrop Lawrence became insolvent and after making its first payments, defaulted on its notes and ceased to make payments thereon to Emroy or the Estate; *defendant defaulted on and refused . . . to honor the personal guarantee he had executed for the payment of the said notes by Winthrop Lawrence.* (emphasis added)

"15. By reason of the foregoing, plaintiff Emroy was damaged in the amount of $509,120, and plaintiff Estate was damaged in the amount of $3,405,064."

Thus, Emroy's and the Estate's own complaint characterizes the injury resulting from the alleged fraudulent misrepresentations and omissions as being the failure of Copeland to honor the guarantee. This single injury is that Emroy and the Estate gave up something of value (Transogram stock valued at $6 per share) for which they were never fully compensated. Accordingly, it is concluded that defendants' securities fraud claim contained in Claim 1 originates or is founded upon an express contract—the guarantee—as that language is used in *Crawford v. Burke, supra,* 195 U.S. at 193, 25 S.Ct. 9.

This conclusion is not avoided by Emroy's and the Estate's argument that their assignment of the Copeland guarantee rendered their fraud claim not provable. Defendants, by making this argument, urge that the assignment of the contract claim to the banks somehow severed the relationship between the contract claim and the fraud claim, such that the fraud was no longer provable and not barred by the discharge. The short answer to this argument is that Emroy and the Estate have confused allowability with provability. The assignment of the contract claim is irrelevant to the question of the provability of the fraud claim contained in Claim 1.

Emroy and the Estate have asserted the entire matter contained in the New York complaint is controlled by *In re Crimmins,* 406 F.Supp. 282 (S.D.N.Y.1975). They contend *Crimmins* holds that securities fraud claims under Section 10(b) of the 1934 Act and Rule 10b–5 being statutory torts are not provable claims under section 63 of the Bankruptcy Act. *Crimmins* is inapposite, since, on the facts of that case, there was no express contract (nor quasi-contract) between the bankrupt and the creditor.[26]

It is held the cause of action of Emroy and the Estate set forth in Claim 1 of the New York complaint being founded upon an express contract is a provable claim within the meaning of section 63a(4) of the Bankruptcy Act. *See SEC v. C. H. Wagner & Co., Inc.,* 373 F.Supp. 1214, 1220 (D.Mass.

---

**25.** It is noted Emroy and the Estate filed proofs of claim based solely on the guarantee. *See supra,* p. 513.

**26.** In further support of their contention that statutory torts are *per se* not provable in bankruptcy, defendants cite *In re Paramount Publix,* 8 F.Supp. 645 (S.D.N.Y.1934), and *Goldsmith v. Overseas Scientific Corp.,* 188 F.Supp. 530 (S.D.N.Y.1960), which both held that statutory tort claims for patent infringement were not provable in bankruptcy; and *In re Law Research Service, Inc.,* 74–B–598 (S.D.N.Y.1972) (Herzog, Referee in Bankruptcy), which extended this rule to claims for copyright infringement. However, these decisions were not predicated merely on the fact that the cause of action arose from a "statutory tort," but rather focused on the unique characteristics of those particular types of actions in concluding that they did not create quasi-contractual relationships or arise from express contracts. Moreover, in *Paramount Publix,* Judge Patterson specifically acknowledged that fraud claims could be provable under section 63a(4), 8 F.Supp. at 645–46, which further rebuts any inference that the decision was intended to establish a broad exclusion from provability for *all* statutory torts.

1974). Pursuit of the Claim 1 cause of action thus is barred by operation of the discharge granted Copeland on November 12, 1974.

### Claim 2—The Claim of the Individual Defendants and Emroy for Relief in the New York Action

Claim 1 and Claim 2 of the New York action both brought under section 10(b) and Rule 10b–5 are similar in that both are grounded upon the same alleged misrepresentations and omissions. However, they differ in that Claim 1 seeks damages for the sale of Transogram stock by Emroy and the Estate. In contrast, Claim 2 seeks damages by Emroy, Edna Mae Fadem, Patricia T. Raizen and Roy Raizen for their Transogram stock which was not sold to Winthrop Lawrence.

Restricting as I must this Court's inquiry to whether Claim 2 states a provable claim under section 63 of the Bankruptcy Act yields an anomalous result. If a substantive portion of Claim 2 were based upon the sale of Transogram stock by the Estate and Emroy, it would be barred as being founded upon an express contract under section 63 for the reasons set forth in the prior discussion of Claim 1. However, this conclusion is not dispositive of Claim 2, since, notwithstanding that the substantive fraudulent acts are for the most part identical to those alleged in Claim 1, Claim 2 seeks damages only for the Transogram stock *not* sold to Winthrop Lawrence.

■ Copeland urges that Claim 2 should be considered inextricably related to Claim 1 so as to require a holding of provability under section 63 of the Bankruptcy Act. This position ignores that there was no express contractual relationship between

Copeland and the individual defendants and Emroy in their capacity as *non-sellers* of stock. Accordingly, the Court holds that Claim 2 is not founded upon an express contract.

■ As to whether Claim 2 is founded upon a contract implied in law (quasi-contract),[27] the Court is unable to make this determination on the present record. Assuming *arguendo* that defendants' allegations make out a prima facie cause of action under Rule 10b–5[28] and/or New York General Business Law § 352–c, unresolved in the present record is the mixed question of law and fact whether Copeland was unjustly enriched as a result of the alleged injury suffered by defendants, such that a quasi-contractual obligation properly may be implied. Moreover, resolution of this question is contingent upon the exact nature of the relationship, if any, between Copeland and these defendants, and Copeland's involvement, if any, in the activities which allegedly reduced the value of Transogram stock still retained by the individual defendants and Emroy. Given these uncertainties in the present record, which present genuine issues of material fact, the Court concludes that it cannot grant summary judgment to either party regarding the provability of Claim 2.

### Claim 3 of the New York Complaint

This pendent state law claim incorporates by reference the substantive paragraphs of Claims 1 and 2. Accordingly, disposition of Claim 3 necessarily follows that of the previous claims. Thus, to the extent that Claim 3 incorporates the substantive paragraphs of Claim 1, it is barred as founded upon an express contract; but to the extent

---

**27.** Copeland's assertion that defendants' claim is one based upon a contract implied in fact, or that defendants could have sued on the implied promise that no material misrepresentation had been made in the transaction, is not separately addressed. This novel approach to the law of contracts implied in fact must be rejected as totally unsupported by any authority or case law. At best, this argument is but a variation of Copeland's contention that a contract implied in law arose between the parties in order

to prevent the unjust enrichment of the alleged tortfeasor.

**28.** The Court is not unmindful that the New York plaintiffs as non-selling shareholders have formidable obstacles impeding the path to recovery. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). These matters are properly left to the New York Court.

that it incorporates the substantive paragraphs of Claim 2, summary judgment is denied both parties.

### Resolution of the Remaining Quasi-Contract Issue

Having denied summary judgment to both parties regarding the provability of Claim 2 and that portion of Claim 3 which incorporates by reference the substantive paragraphs of Claim 2, the Court is faced with selecting the most efficacious means for determining the provability of these claims, which in turn will determine whether they are barred by operation of Copeland's discharge. Rather than proceeding to final judgment at this juncture, it is concluded that the interests of justice best will be served by staying the present proceeding, pending completion of the action in New York.

A review of the pleadings reveals that this matter has been brought before the Court on a complaint filed in the Copeland Chapter XI proceeding which seeks an order which would halt the New York litigation and adjudicate the defendants, including their counsel, in contempt of this Court's Order of November 12, 1974. For the reasons previously set forth, Emroy and the Estate will not be permitted to pursue their claim arising out of the sale of Transogram stock to Winthrop Lawrence, detailed in Claim 1. However, pursuing the remaining issues to final judgment would be time consuming and difficult, and perhaps impossible. To attempt to do so would require a "mini-trial," replicating what the parties intended to present to the New York court. If this Court held that no quasi-contract existed, problems could arise if the proof in the subsequent New York

trial were at variance with what the parties presented herein. A determination that a quasi-contract existed perhaps would end the matter, but even this is far from certain.[29] It will only be after defendants actually are put to their proof that the Court conclusively can ascertain whether a quasi-contract existed between the parties. Moreover, it is a waste of judicial resources to engage in a potentially non-definitive, lengthy proceeding to determine the presence or absence of a quasi-contractual obligation on the part of Copeland, where, facially, there is a serious question as to whether defendants have stated a federal claim upon which relief can be granted.[30]

 Accordingly, where as here, the parties in both pieces of litigation are the same; the likelihood of a nondefinitive result even if final judgment is entered is great if the present proceeding continues; the ability of this Court properly to adjudicate the legal question before it is contingent on facts that can best be adduced in the other proceeding; and there is a major jurisdictional question concerning the propriety of defendants' New York action which can be resolved only in the other forum, the present proceeding will be stayed. Entry of the stay will permit the individual defendants and Emroy to pursue the damages sought in Claim 2 and that portion of Claim 3 which has survived, in the suit pending in the Southern District of New York. *See Rodgers v. U. S. Steel Corp.,* 508 F.2d 152, 162 (3d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). ("The district court [has] inherent discretionary authority to stay proceedings pending litigation in another proceeding.")[31] When and if the New

---

**29.** It is unclear whether defendants would be permitted to amend the New York complaint after this Court determined that the remaining claims were founded upon a contract implied in law (quasi-contract).

**30.** *See Blue Chip Stamps, supra.*

**31.** The origin of this inherent discretionary authority is discussed in *Landis v. North American Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936):

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for the litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."

York matter goes to judgment against Copeland, this Court, upon application, will determine if the matter as actually litigated and resolved in the Southern District of New York constitutes a provable claim within the meaning of section 63 of the Bankruptcy Act.

It is acknowledged that entry of a stay has the obvious disadvantage of both parties being put to the expense of conducting the New York litigation, as limited herein. Further, the Court is not unmindful that the New York plaintiffs are placed in the unhappy position of possibly prevailing in New York, only to be ultimately barred from recovery. However, as previously indicated, there are serious problems with proceeding to final judgment at this time in this action. Most importantly, the stay affords the compensating advantage of permitting this Court to examine the theory and/or proof of defendants' claim, as actually presented in the New York forum, to ascertain whether it constituted a provable claim within the meaning of the Bankruptcy Act. Unless a stay were entered, this Court might be placed in the undesirable position of being requested to rule on the provable claim issue every time there was a change in theory or amendment to the New York complaint.[32]

Submit Order on notice.

## OPINION ON REARGUMENT

Plaintiff Copeland has moved for reargument on the question of whether Claims 2 and 3 of defendants' New York securities fraud action are provable in bankruptcy. Copeland does not challenge on reargument the analytic approach employed by the Court in its earlier opinion or the Court's determination that Claim 2 and the corol-

lary portion of Claim 3 are not founded upon the Copeland guarantee. Rather, Copeland contends that these two claims are provable because founded upon other express contracts or contracts implied in fact entered into by the parties. Specifically, Copeland argues that the remaining securities fraud claims, to the extent that the allegations contained therein are deemed to be true,[1] are founded upon an oral contract which is evidenced by various writings contained in the record.

The first writing cited by Copeland, and the one on which he places the strongest reliance, is the *Second Amended Complaint* filed by the defendants in the New York action, which was not considered by the Court in its prior opinion.[2] Copeland places particular emphasis on paragraphs 18–20 of that complaint, set forth under the heading of Claim 2:

"18. The aforesaid sale by Emroy and the Estate of their shares of Transogram to defendant was part of a complex plan for the reorganization of Transogram conceived and engineered by defendant in which, *inter alia* : control of Transogram was sold by Emroy and the Estate to defendant; defendant was to refinance Transogram's then outstanding debt of $5.4 million; and defendant was to merge into Transogram a collection of business properties (which were falsely represented by defendant as being income-producing) and other assets.

"19. As a result of the aforestated material misrepresentations and omissions and other material misrepresentations and omissions made prior to and in connection with the said sale of Transogram shares and the said plan for reorganization, defendant fraudulently induced

---

**32.** Copeland also advances a number of reasons why the claim, even if not provable, is nonetheless barred on grounds of res judicata, collateral estoppel and equitable estoppel, based on submission of a proof of claim in the Chapter XI proceeding by the Estate and Emroy. To the extent applicable to the surviving allegations in the New York complaint, these defenses are more properly asserted in the New York action.

**1.** Copeland in fact sharply contests the accuracy of these allegations.

**2.** It is noted that this newer complaint in no way affects the Court's holding in its prior opinion that Claim 1 (and the corollary portion of Claim 3) is provable in bankruptcy because founded upon an express contract, the Copeland guarantee; and that Claim 2 (and the corollary portion of Claim 3) is not founded upon the Copeland guarantee.

plaintiffs, Edna Mae R. Fadem and Roy R. Raizen, to agree on behalf of the Estate and Emroy to the transfer of control of Transogram to Shaheen, Winthrop Lawrence and defendant and to vote all of the shares of the Estate and Emroy and all of their shares, including 152,900 shares held individually by plaintiffs Edna Mae R. Fadem, Patricia T. Raizen and Roy R. Raizen, and 60,800 shares retained by Emroy, in approval of the said plan of reorganization. Without the said shareholder approval the said plan of reorganization could never have been consummated.

"20. As a direct and necessary result of the aforestated material misrepresentations and omissions, the merger by defendant into Transogram of worthless assets, and the deliberate failure of defendant to cause to be merged into Transogram income-producing and liquid assets as contemplated by the said plan of reorganization, Transogram became insolvent, rendering the 213,700 shares of Transogram retained by plaintiffs Edna Mae R. Fadem, Patricia T. Raizen, Roy R. Raizen and Emroy worthless."

The second writing cited by Copeland is the following excerpt from the Transogram Proxy Statement dated September 28, 1969:

"It should be noted that the Raizen family presently owns approximately 75% of the total issued and outstanding shares of the common stock which will be entitled to vote at the meeting, that since consummation of the transaction herein contemplated was a condition to the sale of the common stock to Mr. Copeland herein noted, they will vote their shares in favor of the transactions contemplated hereby."

Finally, Copeland cites two passages from an affidavit (Doc.No. 1466) filed previously in this matter by one of the defendants, Roy R. Raizen:[3]

"The arrangement [the refinancing of Transogram] ultimately concluded contemplated (a) the transfer of control of Transogram to Copeland; (b) the cancellation or refinancing of Transogram's outstanding debts; and (c) the merger into Transogram of a group of businesses, properties, and other assets which were represented to be healthy and mutually beneficial to each other and Transogram." (P. 12)

"While the agreement in principle for the sale of the control of Transogram to Winthrop Lawrence was signed on February 4, 1969, the closing of said transaction and the actual transfer of control to Winthrop Lawrence was conditioned upon and delayed pending the conclusion of the complex reorganization plan required by Copeland." (P. 15)

Based on these writings, Copeland advances a two-pronged formulation explaining how the two remaining claims are based on an express contract or contract implied in fact.[4] Copeland's initial formulation, which is broad in scope, suggests that individual defendants and Emroy,[5] by agreeing to vote their personally held (or in the case of Emroy, retained) shares of Transogram in favor of the complex plan of reorganization for Transogram proposed by Copeland (and noting that there was no way that the reorganization plan could have been implemented without said votes), in effect have become "contracting parties" to the entire complex series of agreements comprising the Transogram reorganization plan. Cope-

---

**3.** Copeland previously had moved to strike this affidavit on grounds that it was self-executing in nature. Although no ruling was ever made on this motion, the Court scrupulously avoided reliance on this affidavit in its first opinion. It is assumed Copeland by relying upon the Raizen affidavit has abandoned his motion to strike.

**4.** Since Copeland's position is not that he actually sat down with individual defendants and Emroy and entered into an express oral contract with them, but rather that these writings

all evidence that the remaining fraud claims are predicated on some sort of a "meeting of minds," it is probably more accurate to characterize this purported agreement as a contract implied in fact rather than an express contract.

**5.** It is recalled that Emroy was a party to Claim 2 and the corollary portion of Claim 3 for stock which was retained by it and not sold to Transogram.

land's second formulation, which is more narrow in scope, is that at a minimum, the remaining securities fraud claims advanced by individual defendants and Emroy are founded upon a breach of an alleged agreement consisting of a promise by Copeland to merge "valuable properties" into Transogram in exchange for individual defendants' and Emroy's promise to vote their shares in favor of the reorganization plan. The Court is not persuaded by either formulation.

■ Copeland's suggestion that somehow individual defendants and Emroy can be grafted onto this complex plan of reorganization, which includes numerous agreements with third parties to which they are not signatories, by voting their Transogram shares in favor of the reorganization plan, is difficult for the Court to accept. Moreover, it is equally difficult to understand how this formulation, even if correct, inures to Copeland's benefit. It is not enough for Copeland to show that individual defendants and Emroy were "contracting parties" to the entire plan of reorganization. Rather, what Copeland must show is that their remaining securities fraud claims are founded upon a breach of some contractual duty owed them by Copeland.

■ Copeland's more narrow formulation attempts to address this specific requirement and cannot be dismissed as easily. What is particularly troubling is that paragraphs 18–20 of the Second Amended Complaint are suggestive of some sort of "mutual promise" between Copeland and individual defendants and Emroy. A number of obstacles preclude characterizing this "mutual promise" as a contractual relationship.[6] The first concerns the terms of this mutual promise. A promise to merge "valuable properties" is simply too vague and indefinite to create a binding and enforceable contractual obligation on the part of Copeland. A second problem concerns whether the parties intended these mutual promises to be binding or whether they

represented no more than gratuitous promises. For example, if individual defendants and Emroy did not vote in favor of a certain aspect of the reorganization plan, could Copeland have sued them for breach of contract? Probably not. The final problem is that individual defendants' and Emroy's allegations of fraudulent acts include more than Copeland's failure to merge valuable properties into Transogram. Other alleged fraudulent acts include concealment of Shaheen's legal difficulties by Copeland and alleged misrepresentations concerning Copeland's financial status. Even if the Court were inclined to overlook the earlier obstacles, it is impossible to tie these other allegations of fraudulent acts to any conceivable contract between Copeland and individual defendants and Emroy. Thus, accepting Copeland's second formulation in full would not entitle him to summary judgment that Claims 2 and 3 are provable in bankruptcy.

Finally, Copeland argues that if his contract in law (quasi-contract) argument must be reached, and if his contention that he is entitled to summary judgment on the present record is rejected, the Court should not grant a stay, but should entertain whatever additional proceedings are necessary to decide the issue prior to reactivation of the New York action.

It is initially noted that individual defendants and Emroy must walk a very fine line if and when this matter goes to trial in New York, introducing sufficient evidence to make out a prima facie case of securities fraud without laying a foundation for the argument that Copeland was unjustly enriched as a result of these fraudulent acts. Indeed, the Court strongly suspects if the individual defendants and Emroy prevail in the New York action, it likely will be at the expense of also showing that Copeland was unjustly enriched, thereby ultimately resulting in a judgment for Copeland in *this* proceeding. However, the Court's suspicion of what may happen in the future does not

---

6. Further complicating this situation is that Copeland in fact denies that any mutual promise was struck, but rather is trying through an estoppel argument to turn individual defendants' and Emroy's allegations against them.

provide an adequate basis for entry of summary judgment at the present time. Moreover, on the present record, the Court reaffirms its prior judgment that summary judgment may not be granted on the contract implied in law issue.

This directly raises the propriety of a stay. This Court may have been over-generous in using the phrase "mini-trial" to describe the proceeding that would ensue if this Court were to decide the contract implied in law issue at this time. Unfortunately the question is not one that easily can be severed or decided in a vacuum. To intelligibly rule on this issue, it will be necessary to know, *inter alia*, the specifics of the transactions entered into after Winthrop Lawrence took control of Transogram, Copeland's involvement in these transactions, the direct or indirect benefit therefrom, as well as Copeland's general involvement in the operation of Winthrop Lawrence. I remain firmly convinced that the most efficient way to elicit this information is by way of a full trial on the merits of defendants' and Emroy's claims. Moreover, to require this Court to conduct such a trial for purposes of deciding the contract implied in law issue, and then possibly repeat that trial in its entirety in New York for a ruling on the merits is a completely wasteful and inefficient process.

Accordingly, Copeland's argument that Claims 2 and 3 are founded upon an express contract or a contract implied in fact is rejected. Whether they are founded upon a contract implied in law cannot be determined on the present record, and can best be decided following a trial on the merits of the two claims. A stay of this proceeding will be entered in accordance with this Court's prior opinion, pending disposition of the remaining damages claims in the action filed in the Southern District of New York.[7]

7. The Court is not unmindful of the statistics supplied by Copeland concerning docket congestion in the Southern District of New York. However, as indicated in its prior opinion, the Court has severe reservations whether the remaining claims state a cause of action under Rule 10b–5, in view of the Supreme Court's

Submit order on notice within 10 days on Opinion dated April 14, 1977 and on this Opinion on Motion for Reargument.

ruling in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), an issue this Court is without jurisdiction to decide. Since the entire matter may be resolved on a motion to dismiss, any delay awaiting trial is speculative.