[No. 5006–1.   Division One.   November 6, 1978.]

NAUREEN M. GIAMBATTISTA, ET AL, *Appellants,*
v. THE NATIONAL BANK OF COMMERCE OF
SEATTLE, *Respondent.*

WHITNEY R. TITUS, *Appellant,* v. THE NATIONAL
BANK OF COMMERCE OF SEATTLE,
*Respondent.*

ARNOLD VANT ZELFDE, ET AL, *Appellants,* v.
SECURITY SAVINGS AND LOAN ASSOCIA-
TION, *Respondent.*

*Ruthford, Lind, Van Valin & Watts, Victor Van Valin,* and *Charles E. Watts,* for appellants.

*Adair, Kasperson, Peterson & Hennessey, William F. Hennessey, Graham & Dunn, Stephen A. Crary,* and *Robert A. Medved,* for respondents.

ANDERSEN, A.C.J.—These consolidated cases arose out of the operations of certain New York money brokers in this state. At issue are questions involving the common–law doctrines of champerty and maintenance.

The trial court declined jurisdiction of the cases on the ground that the actions brought by the plaintiffs, as assignees of the money brokers, violated public policy against maintenance—and that the actions presented a potential for attorney conflict of interest regarding settlement. The trial court also denied, or did not rule on, the various parties' cross motions for summary judgment.

### BACKGROUND—THE MONEY BROKERAGE BUSINESS

The issues presented by this appeal are decided on the basis of the appellate record. Some background to the unique business of money brokerage is helpful, however, to an understanding of the dealings which gave rise to this litigation.

In the September 1970 edition of *Banking,* an interview with the acting general counsel of the Federal Deposit Insurance Corporation, entitled "The FDIC Discusses Money Brokers," is reported. The following questions and answers from that article are informative:

Q. *What is meant by the terms money broker, brokered deposit, and link financing?*

A. A money broker is any person or organization who regularly engages in the solicitation of funds for deposit in banks or loans to third parties and receives a fee or other compensation for this service.

A brokered deposit is any deposit which is placed in a bank pursuant to an arrangement with a money broker and for which the depositor receives a premium (usually somewhere between 1% and 3% of his deposit) over and above the interest paid by the bank on his deposit. This premium may be paid by the bank—a practice which is considered a violation of Federal interest rate regulation if the bank is already paying interest on its deposits at the maximum legal rate—or, more typically, it may be paid by one who wishes to borrow funds from the bank.

In a link financing transaction, the bank has some doubts about the credit worthiness of the proposed borrower, is simply short on lendable funds, or desires to increase the effective yield on the loan. It agrees to the loan only on condition that the borrower leave a large portion of his loan on deposit with the bank as a compensating balance or else bring in new deposits at least equal to the loan. The borrower goes to a broker who, for a fee, usually paid by the borrower, arranges to have new deposits placed with the bank. The loan is then linked to these new deposits in the sense that the deposit proceeds are used to make the loans; however, the deposits cannot be used to offset the loan in case of default. In theory, everyone is satisfied. The bank acquires new money to lend. The borrower gets his loan. The broker receives a fee. The depositor gets a premium.

Of course, the banker may find himself saddled with a bad loan, or a liquidity problem when the funds are withdrawn, or both.

* * *

Q. *Is it the FDIC's position that the practice of brokering deposits is hazardous or harmful in and of itself or is it only the linked loans which constitute a danger to the bank?*

A. Of course no bank has ever failed simply because it accepted additional funds for deposit. The failures really result from bad loans and from a large concentration of highly volatile funds invested in long–term loans. The fact is that most brokered deposits are placed with banks in a package with high–risk loans.

However, the argument that the whole problem turns on proper lending practices, effective credit investigations, etc., really ignores the dangerous aspects of brokerage transactions. Money brokers form a nationwide

network. It has been shown that they can generate relatively large sums for deposit in a single bank in a short period.

For example, money brokers operating on a nationwide basis placed $2,700,000 in The Peoples State Savings Bank in Auburn, Mich., in less than eight weeks subsequent to a regular examination of the bank. The transactions in other closed banks were equally fast. The size and speed of these transactions plus a lack of current and specific information on the part of Federal or state authorities as to the situation in each one of the nation's 14,000 banks is an open invitation to fraud and misapplication of the brokered funds received, or, at best, unwise or imprudent lending practices.

\* \* \*

Q. *A money broker has recently stated in the press that he is merely an independent third party and has no interest in what are essentially relationships between banks and their customers. What do you think of this contention?*

A. Brokers are well aware of the hazards which result from transactions of this kind, and they are the necessary element which brings together the deposit and the high-risk loan. We have reason to believe that the broker frequently takes the lead in presenting and selling a packaged transaction to the lending bank. In occupying this role a broker acts more in the capacity of a promoter than that of an independent third party. Moreover, the fee paid to the broker by a borrower is usually the source of the premium to the depositor over and above the interest rate ceilings set by the Federal agencies.

FACTS OF CASE

The facts are complex. Some detail is therefore required.

In 1970 and 1971, and at all times herein, North American International Companies, Inc. (North American) was a Delaware corporation whose offices were located in Mineola, New York. It, as well as Share Brothers Company (Share Brothers), a partnership operating out of Syracuse, New York, were money brokers.

Beginning in January 1970, the maximum rate of interest that any federally insured financial institution could legally pay on any certificate of deposit ("CD") or passbook

account was uniformly limited throughout the country by various federal regulatory agencies. Nevertheless, money brokers such as North American and Share Brothers, although aware of the prohibitions against exceeding the maximum interest rate, were able to bring together depositors (such as the plaintiffs in these cases) and lending institutions which directly or through generally substandard borrowers were willing to pay an additional sum.

Typically, each depositor delivered money, for example, $10,000 to Share Brothers in Syracuse, New York. Share Brothers would acknowledge receipt of the funds to purchase a $10,000 CD to be issued by an unspecified savings and loan association to bear interest at the maximum allowable interest rate, at that time 5 1/2 percent. Each depositor was also to be paid an additional 1 percent as his or her share of the "bonus interest." Share Brothers then transmitted the funds to North American, another money broker, which in turn transmitted them to a Washington resident (hereinafter referred to as the "intermediary"[1]) who obtained CD's for the depositors from a Pacific Northwest area financial institution, customarily a savings and loan association. The intermediary paid the total bonus interest, customarily 3 percent, and from this North American and Share Brothers deducted their fees and the depositors received their 1 percent premium.

Since the savings and loan institution was prohibited from paying more than the specified rate of interest, if the 3 percent bonus interest was paid by a savings institution or its agent, it was illegal. It was not illegal, however, if it was paid by some high risk borrower through link financing or a similar arrangement (see "Background" above). The depositors and the principals in the money brokerage firms all testified in their depositions to the same effect, they neither knew nor cared where the 3 percent bonus interest came from. Their concern was only that the depositors get

---

[1]The intermediary, Carl M. Brandenfels, is not a party to these consolidated actions.

their CD's in a federally insured savings institution and that they all obtain their share of the bonus interest.

The money brokers' ignorance of the source of the bonus interest is quite remarkable when it is considered that they sent approximately $2.75 million to savings institutions in the state of Washington in 1970 and 1971, primarily through this same intermediary.

In placing these brokered funds with savings and loan associations in the state of Washington, North American physically delivered the funds to the intermediary and he then purchased CD's or passbook accounts in the names of the individual depositors. Initially, the brokered funds went into Northwest Guaranty Savings and Loan Association (Northwest Guaranty), a firm which was later placed in receivership after its president, Kenneth Grove, fled the jurisdiction. Subsequently, however, funds were also placed in savings and loan associations other than Northwest Guaranty.

North American had its first dealings with the intermediary in April 1970. In the following year, through him, North American placed over $2.5 million with Northwest Guaranty on 18 different occasions. Each of the transactions was similar in form. North American would send the intermediary checks payable to Northwest Guaranty and letters of transmittal directing him to use the checks to purchase CD's from Northwest Guaranty. The intermediary would then deliver the checks to Northwest Guaranty and have the CD's issued in the names of the depositors. North American did not deal directly with Northwest Guaranty. CD's were always issued in appropriate names as requested by North American.

Because brokered deposits did present some risk to savings institutions (see "Background" above), the Federal Home Loan Bank Board (FHLB) prohibited federally insured savings and loan associations from accepting more than 5 percent of their deposits in brokered deposits.

In due course, the FHLB examined Northwest Guaranty and found that it was violating the 5 percent rule. Northwest Guaranty was thereupon directed to send a letter to its money broker, North American, requesting the names of all investors or depositors that North American had represented in opening accounts with Northwest Guaranty. That letter, which the FHLB required to be sent, also advised North American that *in opening future accounts* North American would be required to certify that no payment was made to anyone by anyone other than the savings and loan association, and that North American had not paid or received any consideration other than the lawful rate of interest.

The FHLB also notified Northwest Guaranty that Northwest Guaranty would be held responsible for the money broker, North American, furnishing the depositors' list.

North American refused to disclose the depositors it had represented, claiming a confidential relationship, and wrote Northwest Guaranty a letter which concluded:

> For that reason we must look to other associations in your area to take care of the investment requirements of our clients.

The principal in North American then commenced using other of his companies to place the brokered deposits in Northwest Guaranty, in violation of the 5 percent rule. North American then also commenced placing brokered deposits in Security Savings and Loan Association (Security), another savings institution in this state.[2] At this point, at least one savings and loan association in the state of Washington advised North American that it had no interest in receiving brokered deposits from it.

The intermediary suggested to North American that in view of the FHLB's close scrutiny, it would be easier in . dealing with savings and loan associations in this state if

---

[2]No evidence suggests that Security Savings and Loan Association itself paid any "bonus interest" in connection with the brokered deposits.

the checks he used to purchase CD's were drawn on Washington banks. Thereafter, in the instances involved herein, North American's checks were made payable to the National Bank of Commerce of Seattle (N B of C).[3]

North American thereupon sent its checks to the intermediary along with letters of transmittal. Each of the checks was certified, was payable to N B of C and bore on its face a notation such as "for purchase of CD's" or "for purchase of CD's for Giambattista" or the like. North American at no time had an account at N B of C. The checks were deposited by the intermediary directly in one of his own checking accounts at N B of C. The intermediary thereupon purchased the CD's from Security with checks drawn on one of his own N B of C checking accounts. In all instances, the CD's totaling some $245,000 were purchased from Security. At no time did North American, through the intermediary or otherwise, purchase any CD's from N B of C.

The present dispute with N B of C arose when it was discovered that $65,000 worth of the CD's which had been purchased from Security by the intermediary had been paid for with nsf checks drawn on the intermediary's N B of C accounts and Security cancelled the CD's purchased with those checks.

Share Brothers thereupon assigned its rights, as the maker of the certified checks, to its depositors who had received the now cancelled CD's. Share Brothers also retained counsel to represent the depositors in a suit against N B of C to recover the depositors' $65,000, the theory of the suit being that N B of C had erred when it allowed the intermediary to deposit the certified checks which were payable to N B of C directly in the intermediary's own checking accounts at that bank.

Through New York counsel for Share Brothers, Seattle counsel was retained to file suit on behalf of the depositors

---

[3]The name of the National Bank of Commerce of Seattle (N B of C) was later changed to Rainier National Bank.

as assignees of the money broker against the bank, with legal fees and costs being paid by Share Brothers. The agreements executed between Share Brothers and the depositors were substantially the same. The operative portion of an illustrative agreement reads:

1. [Depositor] agrees to prosecute in good faith the pending action against THE NATIONAL BANK OF COMMERCE OF SEATTLE in the State of Washington to final conclusion and agrees not to institute any legal action against SHARES or attempt to enforce any alleged claims for damages against SHARES, arising out of the alleged transaction unless and until the said pending action is brought to a final determination.

2. In the event [depositor] shall thereafter institute legal action against SHARES arising out of the alleged transaction, which legal action is not now barred by the Statute of Limitations, SHARES agrees to refrain from pleading the Statute of Limitations as a defense thereto.

The appeal of a separate action involving a case wherein Security was sued by a depositor over a $10,000 brokered deposit placed in a passbook account therein by North American was consolidated for hearing with the other depositors' suits against N B of C. In that case, the suit by depositor Charlotte Vant Zelfde was dismissed on Security's motion for summary judgment, apparently on the same declination of jurisdiction grounds that the suits against N B of C were dismissed, and on the additional ground that the Vant Zelfde action was barred by a written release Mrs. Vant Zelfde had given to Security.

Three ultimate issues are presented.

## ISSUES

ISSUE ONE. Did the trial court err in declining jurisdiction of the depositors' actions against the bank and savings and loan association on the ground that the money broker's conduct, including its agreement to pay attorneys' fees and costs of those actions, violated public policy against maintenance and presented a potential for attorney conflict of interest regarding settlement?

ISSUE TWO. Did the trial court err in denying the depositors' motions for summary judgment against N B of C?

ISSUE THREE. Did the trial court err in granting Security Savings and Loan Association's motion for summary judgment against the depositor who had sued it?

DECISION

ISSUE ONE.

CONCLUSION. The agreement for the prosecution of the suit by the depositors against the N B of C did not involve champerty or maintenance although portions of it were void as against public policy. Courts cannot decline to exercise their jurisdiction because of the motive or purpose of the parties bringing the action, therefore, the trial court erred when it dismissed the depositors' suits.

The strict doctrines of champerty and maintenance, as known to the common law, grew out of causes peculiar to the society of an earlier time. *See* M. Radin, *Maintenance By Champerty,* 24 Calif. L. Rev. 48 (1935–1936). In no state are these doctrines and the laws relating to them preserved with their original rigor. In many jurisdictions, these doctrines have been declared obsolete and, in yet others, are preserved only in a much modified form, usually by statute. *Interstate Collection Agency, Inc. v. Kuntz,* 181 N.W.2d 234, 241 (N.D. 1970); 14 Am. Jur. 2d *Champerty and Maintenance* § 1 (1964). It is questionable whether many remnants of these doctrines remain in this state. *See Weed v. Foster,* 58 Wash. 675, 678, 109 P. 123 (1910); RCW 9.12.010.

We agree with the modern definition of these doctrines as stated by the Supreme Court of Oregon:

Champerty is the intermeddling of a stranger in the litigation of another, for profit, and maintenance is the financing of such intermeddling.

*Groce v. Fidelity Gen. Ins. Co.,* 252 Ore. 296, 304, 448 P.2d 554, 558 (1968). *Accord,* 14 Am. Jur. 2d *Champerty and Maintenance* § 10, at 848 (1964); *Joseph Mazzini Soc'y v. Corgiat,* 63 Wash. 273, 275, 115 P. 93 (1911).

Nothing in the record suggests other than that the agreements relative to the suits entered between the depositors and Share Brothers were negotiated at arm's length. Neither is there any suggestion that Seattle counsel for the depositors acted in anything but the most appropriate fashion. The letter by the original Seattle counsel to the depositors as to whether or not they wanted him to represent them at Share Brothers' expense clearly and objectively related the facts of the matter. Seattle counsel's letter also cautioned that the depositors should get advice concerning the advisability of an action against the money brokers from disinterested New York counsel since he had an obvious conflict of interest in that regard.[4]

The money brokers were parts of the conduit through which money flowed from the depositors to the ultimate depository and they had the legal responsibilities attendant thereto. They claimed to have causes of action against the bank and assigned those causes of action to the depositors. Thus, this is not a case wherein the actions of the money brokers amounted to the officious "intermeddling of a stranger in the litigation of another." The money brokers' conduct in paying attorneys' fees and costs, therefore, does not constitute either maintenance or champerty. *Groce v. Fidelity Gen. Ins. Co., supra; Joseph Mazzini Soc'y v. Corgiat, supra;* 14 Am. Jur. 2d *Champerty and Maintenance* § 10, at 848 (1964).

N B of C's reliance on *Monjay v. Evergreen School Dist. 114,* 13 Wn. App. 654, 661, 537 P.2d 825 (1975) is misplaced. *Monjay* involves a different although related problem, that of settlement agreements such as releases, covenants not to sue, covenants not to execute and similar innovative agreements in cases involving joint tort–feasor

---

[4]The trial court's final order in this case specifically stated with regard to Seattle counsel:

"But the Court notices and states that there is no evidence or suggestion that counsel for [the depositors] in these actions has violated any ethical considerations, and the Court further notices and states its knowledge of the excellent reputation of said counsel for [the depositors] for integrity and in all other matters."

liability. The agreement between the depositors and Share Brothers, however, is not a settlement agreement, therefore, *Monjay* is not in point.[5]

The trial court's final order declining jurisdiction over the depositors' claims stated the following with respect to potential conflict of interest:

The nature of the fee arrangement in regard to these actions, existing by virtue of written agreements between the Share Bros. and [the depositors], creates a potential conflict of interest for [the depositors'] attorneys, both in approaching Share Bros. for a contribution to settlement and also in advising [the depositors] to accept less from the Washington Defendants and to seek a greater share from the New York potential defendants.

■ We share the trial court's concern over the potential settlement conflict inherent in these agreements. The law of the State of Washington favors voluntary settlement of disputes. *Rogich v. Dressel,* 45 Wn.2d 829, 843, 278 P.2d 367 (1954); *Aust v. Bridges,* 17 Wn. App. 554, 556, 564 P.2d 1167 (1977). We hold that to the extent any of the depositors' agreements either prohibit the depositors from settling any claim which they might personally have against N B of C or Security without Share Brothers' consent, or prohibit the depositors from proceeding directly against Share Brothers on the depositors' own claims against Share Brothers, the agreements are void as against public policy and unenforceable. *See Dombey, Tyler, Richards & Grieser v. Detroit, T. & I. R.R.,* 351 F.2d 121, 125 (6th Cir. 1965);

---

[5]For a thorough review of the law relating to pre–trial settlement agreements between some, but not all of the parties to multi–party litigation, *see* Comments, *Blending Mary Carter's Colors: A Tainted Covenant,* 12 Gonzaga L. Rev. 266 (1976–1977). It is to be noted that the agreement in the present case in addition to not being an agreement settling the case between the depositors and the money broker, who were the parties to the agreement, does not have most of the characteristics frequently considered inappropriate in pre–trial settlement agreements such as the so–called Gallagher covenants, Mary Carter agreements and the like including secrecy, foisting a fictitious controversy on the courts, failing to identify the true parties litigant or unfairly concealing from the trier of the fact the true battle lines and interests of the parties litigant.

*Jackson v. Stearns,* 48 Ore. 25, 28, 84 P. 798, 799–800 (1906).

Thus the depositors, despite the agreements they entered into with Share Brothers, retained their right to sue Share Brothers for moneys had and received, breach of contract and violation of the federal securities law. *See Safeway Portland Employees' Fed. Credit Union v. C.H. Wagner & Co.,* 501 F.2d 1120 (9th Cir. 1974).

In connection with the depositors' rights to proceed directly against Share Brothers, it should be added that it is, of course, axiomatic that a person cannot have a multiple recovery for a single wrong. *Monjay v. Evergreen School Dist. 114, supra* at 658.

■ There is, however, nothing in the fact that portions of the depositors' agreements with Share Brothers are void that justified the Superior Court closing its doors to the depositors in these actions. Courts cannot properly decline to exercise their jurisdiction merely on the ground of the motive or purpose of the parties bringing the action. *Hafeman v. Gem Oil Co.,* 163 Neb. 438, 80 N.W.2d 139, 158 (1956); *Adams v. Union R.R.,* 21 R.I. 134, 42 A. 515, 517 (1899); 20 Am. Jur. 2d *Courts* § 93 (1965). The trial court's order declining jurisdiction over the depositors' claims and dismissing their actions must therefore be reversed.

ISSUE TWO.

CONCLUSION. There are material issues of fact in the depositors' suits against N B of C, therefore, the trial court did not err in denying the depositors' motions for summary judgment.

■ The depositors, who are the assignees of North American, the maker of the certified checks, argue that a bank receiving a check drawn in its favor is under a duty to ask instructions from the maker before it disburses the fund. They further argue that since N B of C failed to do this and paid out the proceeds of the checks directly to the intermediary, N B of C is liable to the maker if the party receiving the funds was not authorized to receive them. N B of C does not contend this is not the law, but it does claim

that the intermediary who received the funds was in fact authorized by the maker to receive the funds. In addition, N B of C raises various affirmative defenses.

The depositors argue that the intermediary was either an independent businessman or the agent of the savings and loan associations where the CD's were purchased. N B of C, on the other hand, claims that the intermediary was the agent of the money broker and was authorized to treat the checks exactly as he did. The trial court in its final order denied the depositors' motions for summary judgment ruling that "there are genuine issues of material fact as to the defenses and affirmative defenses of [N B of C] including actual authority, apparent authority, estoppel and ratification; . . ."[6] We agree.

▮ Agency is usually a question of fact. *Busk v. Hoard*, 65 Wn.2d 126, 129, 396 P.2d 171 (1964). Further,

> An agency relationship, of course, may arise without an express understanding between the principal and agent that it be created. It does not depend upon an express undertaking between them that the relationship exists. *Petersen v. Turnbull*, 68 Wn.2d 231, 412 P.2d 349 (1966). If, under the circumstances, the parties by their conduct have created an agency in fact, then it exists in law.

*Matsumura v. Eilert*, 74 Wn.2d 362, 368, 444 P.2d 806 (1968).

It is true, as the depositors argue, that mere possession alone of a negotiable instrument not made payable to the bearer or endorsed without restriction is not proof of the possessor's authority to discharge the payee's or maker's interest. *Owens v. Wood*, 43 Ala. App. 366, 374, 190 So. 2d 734, 741 (1966); Restatement (Second) of Agency § 177 (1958). But there is more here than just the intermediary's possession of the certified checks.

---

[6]From the context in which they are used in the trial court's order, we construe the words "estoppel and ratification" as pertaining to the issue of whether or not the intermediary was authorized to act as he did with respect to the certified checks in question.

It is uncontroverted that North American's principal business was acting as a money broker, raising funds from third parties for placement in savings and loan associations at the request of individuals desiring such placement. It is also uncontroverted that the funds obtained by North American would be forwarded by it to the intermediary for placement in savings and loan associations in the Seattle area. The certified checks in question were sent by North American to the intermediary with letters instructing him to purchase CD's from Security. The checks, however, were not made payable to Security but to N B of C from which no CD's had ever been purchased and where North American never had an account.

Under the unusual facts of this case, and particularly in view of the problems that North American was experiencing in placing its funds due to the close scrutiny of federal officials, the trier of the fact could reasonably find as follows: that the reason the money broker's certified checks were not made payable directly to Security was to conceal the source of the funds being used to purchase CD's from Security; that the only way the intermediary could conceal and deliver the funds to Security for CD's was to "wash" them by first depositing the money broker's checks in one of his personal or corporate accounts, which were at the N B of C, and then writing checks on his own accounts payable to Security, *as he did*; therefore, the intermediary was at least impliedly authorized to handle the checks as he did.

> An implied agency is an actual agency and can be proved from facts and circumstances by deduction or inference; it is established by the words and conduct of the parties and by the circumstances of the particular case. *Sharpe Sign Co. v. Parrish* (1949), 33 Wn. (2d) 883, 207 P. (2d) 758; *Weller v. Speet* (1936), 275 Mich. 655, 267 N. W. 758.

*Turnbull v. Shelton,* 47 Wn.2d 70, 72, 286 P.2d 676 (1955).

*See also* 3 Am. Jur. 2d *Agency* §§ 18, 71 (1962).

█ Considering the evidence and all reasonable inferences therefrom most favorably to the nonmovant party, as we must at this juncture of the litigation, the agent's authority to act as he did with reference to North American's certified checks payable to N B of C was a factual issue to be resolved by the trier of the fact and not by summary judgment. *See Marino Property Co. v. Port of Seattle,* 88 Wn.2d 822, 824, 567 P.2d 1125 (1977). The trial court did not err in refusing to enter a summary judgment in favor of the depositors against N B of C.

█ As the trial court also noted in its final order, N B of C's additional motion for summary judgment on various other grounds "was not scheduled to be heard, was not heard, and need not be scheduled to be heard . . ." It therefore cannot be considered for the first time on appeal. *Fuqua v. Fuqua,* 88 Wn.2d 100, 105, 558 P.2d 801 (1977); *Wegg v. Henry Broderick, Inc.,* 16 Wn. App. 589, 595, 557 P.2d 861 (1976).

ISSUE THREE.

CONCLUSION. There is also a material issue of fact in connection with the release given by Mrs. Vant Zelfde to Security with respect to the scope of the release signed by her, and the intent of the parties in that regard presents a question of fact to be determined from the surrounding conditions and circumstances construed with reference to the language of the release.

In the suit brought by Mrs. Vant Zelfde against Security, which was consolidated with those brought against N B of C, Security's brief "adopt[s] by reference all matters urged or contended by NBofC both as to factual matters alleged, and as to all legal theories and conclusions urged." Our foregoing rulings with respect to the suits against N B of C therefore pertain, where applicable, to the suit against Security.

In addition, Mrs. Vant Zelfde signed a release which Security set up as an additional affirmative defense.[7] No valid purpose would be served by detailing all of the facts surrounding the Vant Zelfde transaction, which are also complex and also involve the activities of the Share Brothers. Suffice to say, we conclude that there are material issues of fact as to whether the release, which by its terms, "pertains to account #5503 solely," was under all of the attendant circumstances intended to release Security from the claim on which the Vant Zelfde action against it is based. 66 Am. Jur. 2d *Release* § 30 (1973). *See Bickford v. Hupp,* 83 Wash. 427, 429, 145 P. 454 (1915).

Reversed and remanded for further proceedings not inconsistent herewith.

WILLIAMS, J. (concurring)—I agree that the trial court was in error in dismissing the actions. There was neither maintenance nor champerty because Share Brothers and First Buffalo Association have a direct financial interest in the litigation.

---

[7]The release, which was bargained for by the parties, is contained in the following letter:

"Adair, Kasperson, Petersen & Hennessey
"Attorneys at Law
"1103 Norton Building
"Seattle, Washington 98104

"Dear Mr. Hennessey:
  "Be it known that Charlotte E. Vant Zelfde does by these presents release and disclaim any rights it may have against passbook deposit #5503 presently held by Security Savings & Loan Association, Kent, Washington, in the name of Inez G. Scotti. Be it further known that *this release and disclaimer pertains to account #5503 solely* and does not pertain to any other account presently on deposit with Security Savings & Loan Association against which said North American International Companies, Inc. may have a claim.

> "Very truly yours,
> "/s/ Charlotte E. Vant Zelfde
> "Charlotte E. Vant Zelfde
> "605 New York Avenue
> "Ogdensburg, New York 13669"

(Italics ours.)

The principal question concerns responsibility for the missing funds. From time to time the plaintiff depositors in New York gave money to Share Brothers to invest in certificates of deposit in financial institutions in the West. Share Brothers transferred that money to the First Buffalo Association of New York which in turn sent it to North American International Company, Inc., also of New York.

Initially, North American paid the local financial institutions directly, mailing checks to Carl Brandenfels in Seattle who had arranged for the purchase of the certificates of deposit. Problems arose when a federal regulatory agency investigated possible violations of its "5%" rule which prohibits savings and loan associations from accepting more than that percentage of deposits in brokered funds. To circumvent these problems, North American deposited the money in its bank and caused certified checks to be drawn which were payable to the National Bank of Commerce and which contained the notation "for purchase of CD's", or similar words. At Brandenfels' request, the Bank of Commerce deposited these checks in his personal accounts. All was well until $65,000 worth of certificates of deposit issued to the depositors were canceled because Brandenfels' personal checks given in payment therefore were returned "nsf." Brandenfels departed shortly thereafter.

The critical issue is whether the Bank of Commerce was justified in depositing the money in Brandenfels' personal accounts. Although the record consists of six pouches of clerk's papers, it is yet unclear what part Brandenfels was playing in the eastern money brokers' game. Bank of Commerce argues that he was North American's agent in the placement of the money. It points out that the checks were sent to Brandenfels for delivery to it and that it was Brandenfels who arranged for or directed the purchase of the certificates of deposit. In addition, Brandenfels was to some extent involved in a bonus and fee scheme carried on in connection with the transactions. The Bank of Commerce was not a party to this.

The depositors argue that the Bank of Commerce is liable for the $65,000 lost because it delivered the proceeds of the checks to an unauthorized party. The checks do evidence a business transaction of some kind, but they do not establish the entire arrangement between North American, Brandenfels, and the Bank of Commerce. It will require a trial to do that.

There are material issues of fact concerning the Vant Zelfdes' cause of action and that, too, should be tried.

DORE, J. (concurring in part and dissenting in part)—

1. I concur that the trial court's granting of defendant banks' motion for summary judgment against all plaintiffs be set aside.

2. I concur in reversing and remanding for trial the case of Vant Zelfde v. Security Savings and Loan Association. However, on retrial, I would limit inquiry to the sole issue of the validity of the Vant Zelfde "release."

3. I dissent in the majority's failure to grant plaintiffs' judgment on their motions for summary judgment in the consolidated cases of Giambattista and Titus v. Rainier National Bank.

Although the consolidated records of these three cases are somewhat lengthy and complex, we need only concern ourselves with two issues.

ISSUE 1: By accepting the services of a free lawyer in bringing these lawsuits, are plaintiffs guilty of violating the public policy of the State of Washington against "maintenance" and, consequently do our Washington courts lack jurisdiction in these lawsuits?

ISSUE 2: Where banks on receiving certified checks made payable to themselves with instructions to purchase certificates of deposit in plaintiffs' names fail to do this but on the request of the party presenting the checks endorse and negotiate such checks and place the proceeds not as instructed but in another party's account without checking back with the makers as to further instructions and such

funds are subsequently misappropriated, are such banks liable to the makers of such CD's?

## FACTS

Plaintiffs are New York residents who in 1970 and 1971 collectively invested through Share Brothers, a money broker[8] in Syracuse, New York, directing them to purchase certificates of deposit issued by unspecified savings and loan associations in the state of Washington.

Beginning in January 1970 the maximum rate of interest any federally insured financial institution could pay on any certificate of deposit (CD) or passbook account was uniformly limited throughout the country by the various federal regulatory agencies. Money brokers such as Share Brothers and North American International were, nevertheless, able to bring together various investors such as the

---

[8] A money broker, as used herein, is one who, for a fee, obtains a higher rate of interest on time deposits (primarily certificates of deposit or passbook accounts) for its customers than those customers could obtain for themselves. The historical background of the money brokerage business, as North American engaged in it in 1970 and 1971, appears in *SEC v. C.H. Wagner & Co.*, 373 F. Supp. 1214, at 1216 (D. Mass. 1974).

As set forth in the court's opinion, prior to January of 1970, savings institutions in western sections of the United States customarily paid a rate of interest on their deposits one or two percent higher than was paid in the northeast section of the country, and money brokers received fees for obtaining such higher interest rates. In January of 1970, Congress enacted legislation imposing a ceiling on the interest rates which might be paid by savings institutions, whatever their location. According to the court, Wagner

> evolved a scheme whereby the legislative ceiling might be avoided and potential investors persuaded that interest rates higher than the maximum legally allowable might be obtained without sacrificing the insurance protection afforded by FDIC insurance.

The scheme involved the money broker locating

> with or without a bank's cooperation . . . a substandard potential borrower willing to pay higher–than–normal interest rates, e. g., a real estate speculator or underfinanced housing developer. It would be agreed among the [money broker] and the potential borrower and the bank that, if the [money broker] arranged for the deposit in the bank of the sum which the developer wished to borrow, the bank would loan the money deposited by the [money broker] to the particular substandard borrower, who would pay a substantial commission or finder's fee to the [money broker]. The portion of the commission paid by the [money broker] to its customer was called the "bonus interest" . . .

373 F. Supp. at 1216.

plaintiffs seeking a greater return on their money on the one hand, and substandard lending institutions on the other, which directly or through substandard borrowers, were willing to pay more than the maximum permissible rate of interest.

The undisputed evidence shows that plaintiffs, in response to various advertisements of Share Brothers in New York to the effect that they would be able to invest in FDIC insured deposits and receive "bonus" interest, contacted Share Brothers for the purpose of buying certificates of deposit. In 1971 plaintiffs collectively placed $70,000 with Share Brothers for the purchase of these certificates of deposit to be issued by unspecified savings and loan associations in the state of Washington. Share Brothers in turn placed plaintiffs' funds with North American for delivery to those savings and loan associations. These funds were transferred from New York to Washington and were ultimately misappropriated in Seattle, Washington.

During the early 1970's Martin Brandenfels, a businessman residing in Seattle, Washington, proposed to North American that North American should attempt to collect funds in amounts determined by Brandenfels which would be used to purchase CD's for clients in various savings and loan associations in the state of Washington. In return for North American's services, Brandenfels would pay a commission based on a percentage (3 percent) of the funds forwarded.

North American, in turn, negotiated with Share Brothers to obtain funds from its Share Brothers customers for investment in CD's.

In consideration of funds received from plaintiffs in causes Nos. 774828 and 780285 (*i.e.*, all plaintiffs except the Vant Zelfdes), North American drew certified checks on its own account made payable to Rainier. Each such check included the instruction on its face—"for purchase C.D. [name of plaintiff]," or similar language. In May 1971 those checks were delivered to Brandenfels in Seattle, Washington, for presentation to defendant Rainier.

Rainier was well aware, at the time the North American checks were presented, that they were payable to Rainier, not Brandenfels. It also knew that this new method was a change from the previous course of dealing whereby Brandenfels had deposited checks payable to himself, not to Rainier. Rainier permitted Brandenfels to deposit these North American checks payable to Rainier to either personal accounts of his own or corporate accounts to which he had the power of withdrawal. Before doing so, Rainier made no attempt to communicate with North American, the maker of the checks. A Mr. Harber, an official of Rainier, testified that he authorized Brandenfels' action even though he knew "that was not proper."

Thereafter Brandenfels drew checks on one or more of these personal or corporate accounts in favor of the savings and loan associations which were to issue the CD's. As those checks were received, the CD's were issued and forwarded to plaintiffs in causes Nos. 774828 and 780285 (Court of Appeals, Division One 5006–I) (all plaintiffs except the Vant Zelfdes). However, the checks drawn by Brandenfels for the purchase of these CD's for plaintiffs proved to be nsf. In due course these CD's which had been issued in exchange for nsf checks were declared void by the issuing institutions.

These transactions were initiated by Brandenfels' sending 3 percent of the funds to be received to North American who, in turn, kept 1 1/2 percent and transmitted the remaining 1 1/2 percent to Share Brothers who, in turn, kept 1/2 percent and promised and/or paid the other 1 percent to the plaintiff investors. In effect, the investors would be receiving a certificate of deposit providing for 5 1/2 percent interest plus a bonus of 1 percent. The record is *silent* as to who supplied the 3 percent to Brandenfels. Share Brothers, in turn, would then receive the money from the investors and transmit the money to North American who would then give a certified check on its own account made payable to Rainier which they transmitted for delivery to Brandenfels.

### PLAINTIFF VANT ZELFDE FACTS

The facts involving Vant Zelfde v. Security are basically the same as those of plaintiffs Giambattista and Titus v. Rainier, with minor exceptions. However, in Vant Zelfde, she executed a release to Security for passbook deposit No. 5503 where plaintiff's money was deposited. Security claims although it might have originally been liable for conversion and/or money had and received, that the Vant Zelfde release exonerates it. However, Security received no release from North American. Vant Zelfde in her release reserved any claim that North American might have against Security.

*Brandenfels' misappropriation of designed CD funds led to Share Brothers financing litigation of plaintiffs against defendants Rainier and Security.*

During the summer of 1971 North American discovered that some of its checks made payable to Rainier had been endorsed by Brandenfels for purchase of King County property. This prompted North American's formal demand of Rainier that Rainier account for the lost funds caused by its failure to comply with North American's instructions typed on the face of North American's checks to "purchase CD's" for particular named customers.

Share Brothers, recognizing that it was subject to claims by plaintiffs, obtained legal counsel to initiate action against North American, Rainier and Security. Share Brothers first sent letters to plaintiffs indicating its intent to bring actions in the name of and at no cost to plaintiffs. Share Brothers agreed to pay all legal fees incurred.

Sometime in late November or early December 1973, the plaintiffs received a communication from Washington attorney, Joseph C. McKinnon, dated November 26, 1973, bearing the title "Report to Clients and Prospective Clients Re Claims Against National Bank of Commerce and Security Savings and Loan Association." In relating the history of this dispute the report set forth the following facts:

1. Share Bros. offered to retain the law firm of Segal, Rivo & Loonsk to represent plaintiffs and pay all legal expenses in suits to recover against potential defendants.

2. Segal, Rivo & Loonsk brought suits on behalf of three plaintiffs against North American, Brandenfels, Security and Rainier in the New York Federal Court.

3. In the spring of 1973 these actions were transferred to Seattle, Washington.

4. Share Bros. then retained Joseph C. McKinnon, a Seattle attorney, to represent plaintiffs in the transferred cases.

5. Mr. Loonsk of Segal, Rivo & Loonsk had suggested that "potential New York state defendants" would probably waive the statute of limitations if the aggrieved customers would postpone action against Share Bros. pending conclusion of efforts at collection from the "Seattle banking organizations."

This report concluded with the following paragraph:

If satisfactory assignments are received from North American, I am willing to represent any of you who ask me to bring a Washington state court suit in your name on your own claim and on the assigned claim of North American against N.B. of C. or Security Savings. Share Brothers have advised that they are willing to pay my fees for representation of you in such suits. Please write and advise if you wish me to file such a suit for you.

Subsequently in December of 1973 each of the plaintiffs obtained from North American an assignment of the latter's claim against the defendant banks. Thereupon McKinnon commenced these state court proceedings on behalf of plaintiffs against the banks.

On January 23, 1975, the Seattle law firm of Jones, Grey & Bayley was substituted for McKinnon as counsel for plaintiffs. Each of the agreements of the plaintiffs that they signed with Share Brothers obligates the signatory plaintiffs as follows:

[T]o prosecute in good faith the pending action against the NATIONAL BANK OF COMMERCE IN SEATTLE [Rainier] in the State of Washington to final conclusion. . . .

748

Signatory plaintiffs further agreed:

> [N]ot to institute any legal action against SHARES [Share Brothers] or attempt to enforce any alleged claims for damages against SHARES, arising out of the alleged transaction unless and until the said pending action [against NBofC and Security Savings & Loan in Washington] is brought to a final determination.

In return, Share Brothers agreed that the statute of limitations on any claim of the plaintiffs against Share Brothers would be tolled until "final determination" of the Washington action, as well as agreeing to pay all of plaintiffs' legal expenses.

DECISION REGARDING CONSOLIDATED APPEALS OF
GIAMBATTISTA, ET AL, AND WILLIAM R.
TITUS, No. 5006–I

ISSUE 1: Maintenance

I feel it would be helpful at this juncture to define such terms as "maintenance" and "champerty."

"Maintenance" is defined as "A layman's furnishing money to permit a lawyer to provide, in part, costs and expenses in carrying on litigation for a third party". Black's Law Dictionary 1106 (4th ed. 1951).

"Champerty" is defined as "A bargain by a stranger with a party to a suit, by which such third person undertakes to carry on a litigation at his own cost and risk, in consideration of receiving, if successful, a part of the proceeds or subject sought to be recovered." Black's Law Dictionary 292 (4th ed. 1951).

In *Weed v. Foster,* 58 Wash. 675, 678, 109 P. 123, 124 (1910), by way of dictum it was stated:

> The common law doctrine of maintenance, like that of champerty, "has never obtained a foothold" in the State of Washington. Even if it has, it most probably has been abrogated by enactment of Washington's barratry statute, Rem. & Bal. Code & 2370, now RCW § 9.12.010.

I believe and specifically hold that maintenance and champerty is abrogated in the state of Washington pursuant to RCW 9.12.010.

However, even if the doctrine of maintenance were still in existence in the state, the alleged contract of maintenance can be relied upon as a defense only by the parties to the contract in an action for enforcement of the contract. *Weed v. Foster, supra.* The defense of maintenance cannot be raised to avoid liability on a cause of action unaffected by the alleged contract of maintenance itself.

Even if defendant banks could have properly raised the issue of maintenance as a defense, they were not entitled to the relief granted. "Maintenance" occurs only when a person having no interest in the subject matter of the lawsuit agrees to support that litigation. *Joseph Mazzini Soc'y v. Corgiat,* 63 Wash. 273, 275–76, 115 P. 93, 94 (1911). In the subject case Share Brothers was a potential defendant in the event plaintiffs were unsuccessful in securing back their invested funds from the defendant banks and would, therefore, have a clear and tangible interest in the subject matter of the litigation. Share Brothers had every right to financially support the payment of attorneys' fees for plaintiffs' actions against the banks.

The defendant banks rely heavily upon *Monjay v. Evergreen School Dist. 114,* 13 Wn. App. 654, 661, 537 P.2d 825, 830 (1975). The *Monjay* case was an action for personal injuries sustained by plaintiff school girl Monjay when struck by the defendant school bus. Prior to trial plaintiff entered into a covenant not to sue General Motors Corporation and Ed Randall Chevrolet, the manufacturer and dealer of the school bus respectively. Pursuant to that covenant, General Motors and Ed Randall Chevrolet agreed to pay the plaintiff $33,333. At the conclusion of the trial against the defendant school district, plaintiff agreed to dismiss the covenanting defendants from the action and agreed further that should she obtain a judgment against the school district, she would reimburse General Motors and Ed Randall Chevrolet in the amount recovered by her from the school district to a maximum of $33,333.

The appellate court in *Monjay* found the loan agreement to be totally repugnant to the principle of pro tanto reduction attendant to the covenant not to sue and against public policy. The court reasoned as follows at page 661:

> There is yet an additional feature of the subject covenant which we find disturbing. It amounts to nothing more than an agreement between two concurrent tort–feasors to conditionally pay an injured plaintiff a stated sum if he pursues his claim against a third concurrent tort–feasor. It is not merely a covenant by the plaintiff *not* to sue the two defendant covenantors, but it affirmatively requires plaintiff to sue the defendant school district alone. No payment is to be made until the conclusion of the trial against the school district. *It is our opinion that this agreement contains strong overtones of champerty which we cannot sanction.*
>
> For the reasons thus given, we are compelled to hold that the conditional repayment clause in this covenant is void and of no effect.

(Italics mine.)

The court in *Monjay* did not set the covenant not to sue agreement aside. It merely provided that the repayment agreement of the minor plaintiff was invalid and gave plaintiff the option to rescind the whole agreement or to waive the contribution provision.

*Monjay* is clearly distinguishable on the facts.

1. The trial court in the subject case held that the payment of the attorney's fee by Share Brothers was *maintenance* and in violation of the public policy of the State of Washington. The *Monjay* case based its decision on *champerty alone.*

2. In *Monjay* there was an agreement between two of the three joint tort–feasors to contribute a fixed sum to plaintiff on the condition they covenant not to sue. In the subject case Share Brothers did not secure a covenant not to sue but merely reached an agreement with plaintiffs that it would underwrite the costs of a lawsuit against the defendant banks if plaintiffs would agree to prosecute in good faith the pending action to final conclusion, and they would

not institute any legal action against Share Brothers unless and until the pending actions against the banks were brought to a final determination. A "final determination" could be effectuated by either a verdict or settlement. In return, Share Brothers agreed to waive the statute of limitations that might apply against it because of the delay in suing it directly.

3. There was no provision for reimbursement of Share Brothers for having advanced the costs and litigation fees so obviously this could not be champerty. Nor can it be maintenance for although Share Brothers was financing the cost of the litigation in the state of Washington, it had a very real and substantial interest in the litigation for in the event plaintiffs were unsuccessful against the banks, undoubtedly they would have sued Share Brothers and North American directly for return of their funds based on a theory of money had and received and/or breach of contract in failing to produce a valid certificate of deposit from a savings and loan bank in Washington. There is nothing in the subject case factually even if maintenance and champerty were still to exist in the state of Washington which would make it a violation or would make it against the public policy of this state. The assignment of North American's cause of action against the defendant banks to the plaintiffs was entirely proper as it had been the recipient of plaintiffs' funds which they had transmitted in certified checks to the banks through Brandenfels.

Again, *Monjay* can also be distinguished by the fact that Share Brothers and North American were not joint tort–feasors with the banks which caused the loss. Factually it is clear that the conversion (misappropriation) was caused by the negligence of the banks in not issuing checks to the savings and loan companies in accordance with the plain language on the face of the checks, and it had no authority to give the proceeds on the cashing of such checks to a third party like Brandenfels without checking back with the maker of the instrument which in this case would have

been North American. Certainly the defendant banks cannot contend that Share Brothers or North American had anything to do with their negligence, which caused plaintiffs' loss of some $70,000.

We hold that the summary judgment of dismissal of plaintiffs' consolidated lawsuits should be set aside.

ISSUE 2:

Question: Are defendant banks liable to plaintiff investors as a matter of law? (Should plaintiffs' motions for summary judgment be granted?)

Answer: Yes.

In *Federal Ins. Co. v. Groveland State Bank,* 44 App. Div. 2d 182, 354 N.Y.S.2d 220 (1974), the plaintiff insurance company, as subrogee by virtue of payment under an employee's fidelity bond, sought to recover monies received by defendant bank (Groveland) when Groveland cashed checks drawn to its order by plaintiff's assignor. Groveland credited the proceeds of those checks to an account of one of its depositors, one of the assignor's employees. That employee had fraudulently arranged for issuance of the checks in the name of Groveland and had then persuaded Groveland to deposit them to his account. The court granted summary judgment to the plaintiff holding that Groveland had a clear *duty to inquire* of the drawer of the checks *before disbursing the funds to the possessor.*

In *Federal Sav. & Loan Ins. Corp. v. Kearney Trust Co.,* 151 F.2d 720 (8th Cir. 1945), the president of a savings and loan institution presented checks drawn by the savings and loan in favor of Kearney Trust Co. When the checks were received by the trust company, it wrongfully credited them on its books to the president of the association paid out on his order for use in his personal business. There the appellate court upheld the jury award in favor of the plaintiffs, holding that where the bank had knowledge that Federal Savings and Loan's president had directed that the association's checks payable to the order of the bank be credited to the president's personal account, that bank failed to

make inquiry regarding the president's authority and the ownership of funds was apparent from the face of the checks. The bank was liable to the savings and loan association of assignee for the amount of the checks.

Again, in *New Jersey Nat'l Bank & Trust Co. v. Sachs,* 91 F.2d 533, 534 (3d Cir. 1937), the president of a car dealership persuaded a bank to credit his account with a check drawn in the bank's favor by a finance company. In fact, the check originally had attached to it a stub instructing the bank that the proceeds were only to be applied against sight draft and bills of lading for certain automobiles. The court held, at page 534:

> [T]here was a plain legal duty upon the bank, in view of the fact that the check was made payable to its order, to communicate with the discount company for exact instructions concerning the disposition of the fund.

By failing to do so, the bank became liable to the finance company for its loss when the auto dealer received the funds without restriction.

In each case discussed above, as in the subject case, the bank had a plain legal duty to contact the drawer of the check before it disbursed the fund.

In the subject case the bank's duty is even more obvious because in this case each check bore instructions such as "purchase CD for [plaintiff's individual name]." I hold that Rainier, by failing to make any inquiry of the maker of the CD's under the circumstances set forth herein, became liable to plaintiffs as a matter of law. The only remaining issues are whether Rainier's affirmative defenses negate that liability. Let us now examine such defenses:

1. FIRST AFFIRMATIVE DEFENSE: Plaintiffs' claims are barred since their assignor, North American ratified or is estopped from denying Brandenfels' agency relationship with North American and, therefore, they are estopped to deny the authority of Martin Brandenfels to deposit checks to his own account.

Brandenfels was not the agent of North American for the record shows that Brandenfels approached North American

on behalf of Northwest Savings and Loan. North American did not hire Brandenfels. North American did not compensate Brandenfels nor did it care how he was compensated, but in fact Brandenfels paid North American its 3 percent fee. Assuming, however, that Brandenfels was the agent of North American with respect to these transactions, there is no evidence that he was authorized by North American to deposit such checks in his personal account. The checks themselves were drawn to the order of Rainier and inscribed with a further designation "purchase of CD [designating a certain party]". North American at no time intended that Brandenfels had authority to deposit checks to his own personal account.

Restatement (Second) of Agency § 177 (1958) states:

A disclosed or partially disclosed principal who entrusts an agent with the possession of a negotiable instrument not payable to bearer or endorsed to the agent is not thereby subject to the loss of his interests therein by the collection of the claim or the transfer of the document by the agent.

I believe this rule means, in the context of this case, that:

Possession alone of a negotiable instrument neither payable to bearer nor endorsed without restriction is not an indication of authority to discharge the payee's [or maker's] interest.

*Owens v. Wood,* 43 Ala. App. 366, 374, 190 So. 2d 734, 741 (1966). Without any other proof of authority, one who gives value for the instrument is liable to the maker or the payee. In the cited case, an employee of the payee on a check persuaded a store owner to cash the check for him [the agent] personally. The store owner was held liable to the payee employer since, other than the possession of the check, there was no other proof that the employee had authority to cash the employer's checks. Cases like *Owens v. Wood, supra,* are based upon the well established rule that "authority to execute negotiable instruments will be strictly construed. . . ."

This contention was raised in *Federal Sav. & Loan Ins. Corp. v. Kearney Trust Co., supra,* wherein the court held the trust company liable where the president of a savings and loan institution directed the bank to cash checks made out to the bank and put the proceeds in his personal account. *See* other cases, *New Jersey Nat'l Bank & Trust Co. v. Sachs, supra; People ex rel. Nelson v. Peoples Loan & Trust Co.,* 285 Ill. App. 552, 2 N.E.2d 763 (1936).

I find Rainier's first affirmative defense to be without merit.

2. SECOND AFFIRMATIVE DEFENSE: That plaintiffs are estopped to deny the authority of Martin Brandenfels to deposit checks to his own account.

Rainier argues that by sending the checks to Brandenfels, North American cannot now argue that he had no power to deposit them. Rainier further contends that by failing to immediately inspect the endorsements on its checks and notify it of the impropriety of Brandenfels' endorsement, North American and, therefore, its assignees were estopped from contesting the validity of the endorsement and Rainier's handling of the checks.

This estoppel contention was raised in the New York case, *Borrello v. Perera Co.,* 381 F. Supp. 1226, 1231 (S.D.N.Y. 1974), on nearly identical facts as here. The court stated at page 1231:

> Under the laws of the State of New York a payee may not obtain rights to collect a check to a third party without first making inquiry of the maker. Federal Insurance Company v. Groveland State Bank, 44 A.D.2d 182, 354 N.Y.S.2d 220 (4th Dept. 1974); Arrow Builders Supply Corp. v. Royal National Bank, 21 N.Y.2d 428, 288 N.Y.S.2d 609, 235 N.E.2d 756 (1968); Sims v. United States Trust Company, 103 N.Y. 472, 9 N.E. 605 (1886).
>
> Perera was required to inquire as to the purposes for the issuance of the checks. Fidelity & Casualty Co. of N. Y. v. Hellenic Bank Trust Co., 181 Misc. 40, 45 N.Y.S.2d 43 (1943), aff'd mem. 181 Misc. 44, 47 N.Y.S.2d 295 (App.Term, 1st Dept. 1943).
>
> . . .

The defense of equitable estoppel has not been maintained.

Moreover, the defense of alleged failure to inspect the checks returned from the bank is no defense to this defendant. This principle applies only between depositors and the banks. Wagner Trading Co. v. Battery Park National Bank, 228 N.Y. 37, 126 N.E. 347 (1920); Federal Insurance Company v. Groveland State Bank, supra, 44 A.D.2d 182, 354 N.Y.S.2d 220 (4th Dept. 1974).

The Uniform Commercial Code, Section 4-406, sets out the duty to examine returned checks and that section specifically refers only to the relationship between a bank and its customer. There was no such relationship between plaintiff and defendant.

This is true of the facts in the subject case as there was no relationship between plaintiffs and North American and Rainier, as to constitute a bank and its customer. Consequently this defense has no validity.

3. THIRD AFFIRMATIVE DEFENSE: North American by its actions ratified the method of endorsement and collection of the checks.

In a recent case the Washington Court of Appeals quoted with approval the following language from 2 R. Anderson, *Uniform Commercial Code* § 3-404:7, at 924 (2d ed. 1971).

To constitute ratification of an unauthorized signature it must be shown that the person sought to be bound by the alleged ratification has full knowledge of all material facts and expressed an intent to ratify the unauthorized act.

*Thieme v. Seattle–First Nat'l Bank*, 7 Wn. App. 845, 848, 502 P.2d 1240 (1972).

In the subject case North American had no knowledge of the improper endorsement until it received word of the cancellation of the certificates of deposit. Upon learning of the improper endorsement, North American promptly notified Rainier. As North American had no knowledge of the nsf checks, it cannot be held that they ratified Brandenfels' endorsement.

Defendants were allowed to amend their answers to plead the additional defenses of (a) statute of limitations, and

(b) the illegal activities of North American, as assignor, barred a suit by plaintiffs, as assignees.

4. FIRST ADDITIONAL AFFIRMATIVE DEFENSE: That the actions of the plaintiffs are barred by the statute of limitations.

The record indicates that the two actions brought against Rainier that are presently on appeal were commenced on December 28, 1973, and May 8, 1974, well within the 3–year statute of limitations.

5. SECOND ADDITIONAL AFFIRMATIVE DEFENSE: Plaintiffs' claims are barred by illegality on the part of North American in the following particulars: (a) in transacting business in the State of Washington without being legally qualified; (b) by evading certain federal banking laws and regulations; and (c) unlawfully selling unregistered securities.

In reference to (a), North American was not transacting any business in the state of Washington but was engaged in interstate commerce and, therefore, was exempt from qualifying under our statute. Qualification statutes, by their nature, are regulatory and cannot constitutionally be imposed on corporations engaged exclusively in interstate commerce. *Eli Lilly & Co. v. Sav–On–Drugs, Inc.,* 366 U.S. 276, 278–79, 6 L. Ed. 2d 288, 81 S. Ct. 1316 (1961); *Nippert v. Richmond,* 327 U.S. 416, 90 L. Ed. 760, 66 S. Ct. 586, 162 A.L.R. 844 (1946); *Anglo–Chilean Nitrate Sales Corp. v. Alabama,* 288 U.S. 218, 77 L. Ed. 710, 53 S. Ct. 373 (1933).

North American was a Delaware corporation and during the relevant time period it had no offices or employees in the state of Washington nor did it own or have any interest in real estate in Washington. North American simply mailed funds with instructions to Brandenfels via the United States mail in interstate commerce.

In reference to (b), alleging of evading certain federal banking laws and regulations, I find that North American is not an insured financial institution and is not subject to compliance with federal banking laws and regulations. The facts show that North American received a fee for placing

certificates of deposit for their customers in the accounts of associates and there is nothing illegal in this transaction.

In reference to (c), North American's allegedly illegal sale of unregistered "securities" precludes the prosecution of these actions. I do not agree. Restatement of Torts § 889 (1939) states in relevant part:

> A person is not barred from recovery for an interference with his legally protected interests merely because at the time of the interference he was committing a tort or a crime . . .

The Washington courts have consistently held that a plaintiff's violation of a permit or licensing requirement does not bar his action in tort. *See, e.g., Hayes v. Brower,* 39 Wn.2d 372, 390–92, 235 P.2d 482, 25 A.L.R.2d 1431 (1951); *White v. Kline,* 119 Wash. 45, 204 P. 796 (1922). The Washington decisions have adopted the reasoning that such violations by the plaintiff are not the proximate cause of plaintiff's injury and, therefore, cannot bar his action for recovery.

In the subject case there was no relationship between North American's allegedly unlawful failure to register "securities," and Rainier's conversion of North American's certified checks.

I would have granted summary judgment for plaintiffs against the National Bank of Commerce.

DECISION: VANT ZELFDE V. SECURITY, No. 5007–I

The summary judgment of dismissal granted to defendant Security against Vant Zelfde must also be set aside for the same reasons as set forth herein, in setting aside the summary judgments of dismissal in Giambattista v. Rainier, and Titus v. Rainier, et al, unless we determine that Vant Zelfde's release given to Security exonerates Security from any action by Vant Zelfde and North American.

After Mrs. Vant Zelfde gave her check to Share made out to North American, Share Brothers transmitted the check to North American. North American then deposited the

check in its account and issued its own check to "pay to the order of Security" with the designation "for purchase of CD, C. Vant Zelfde." North American's check was then transmitted to Brandenfels with instructions to buy a CD for C. Vant Zelfde. Somehow the check got into the hands of Agosto, then living at Yelm, Washington, and was then presented to Security for the purpose of purchasing a CD with the name "Agosto" inked in right after the name of Vant Zelfde. When Agosto gave the check to Security, he requested that the passbook be issued in the name of Scotti. Undoubtedly at that point North American had a good cause of action against Security for conversion and for money had and received, for it issued the passbook in a name other than what was on the face of the check, and without checking back with the maker as to his wishes on the matter. Security and its counsel became aware of the activities of North American and Share Brothers and was concerned as to the possible double claim against bank account No. 5503. The attorney for Security wrote First Buffalo Corporation (a Share Brothers subsidiary corporation) as follows:

Our records indicate that this account was opened by a Mr. Joseph Agosto of Yelm, Washington, on May 28, 1971. The circumstances surrounding the opening of this account indicate to us that there may be conflicting claims to funds on deposit.

Prior to making any disbursement of the funds in this account, we will require that we have a release from Inez G. Scotti, C. Vant Zelfde, First Buffalo Corporation and North American International Companies, Inc. We will also require that the agents for Inez G. Scotti and C. Vant Zelfde, *i.e.,* First Buffalo Corporation and North American International Companies, Inc. indemnify Security Savings and Loan Association and agree to hold it harmless from any conflicting claims made as to the proceeds of this account . . .

Security's attorney then received a release from Charlotte Vant Zelfde releasing any claim to account No. 5503 with Security.

On July 20, 1972, the attorney for North American wrote the attorney for Security:

As you are already aware this office represents North American International Companies, Inc. I have been advised by my client that it now agrees to indemnify and hold harmless Security Savings and Loan Association from any conflicting claims made against account No. 5503.

However, Security failed to get a general release from the various parties but secured only a release and indemnity agreement as against savings account No. 5503.

From an examination of the various letters exchanged between the parties, and in particular from reading Charlotte Vant Zelfde's deposition, I hold it is a question of fact as to whether the Vant Zelfde release to bank account No. 5503 released Security from any claim by Vant Zelfde and North American. Mrs. Vant Zelfde testified that she signed the release on being advised that it was a mere technicality to receive the $10,000 she had deposited with Security. The trial court will have to determine her credibility and the circumstances as to how the release was secured. In addition, the trial court must find whether the release pertained only to account No. 5503, or was broad enough to preclude plaintiff's action for conversion and/or for money had and received. The court must also determine whether the indemnity agreement of North American, as contained in its letter to Security under date of July 20, 1972, would estop them and their assigns from bringing this action. These are all factual issues which must be resolved by the trial court after testimony and not by summary judgment.

In summary, I would hold:

1. That in the consolidated cases of Giambattista, et al v. Rainier National Bank, King County cause No. 774828, and Titus v. Rainier National Bank, King County cause No. 780285, the summary judgments granted to defendant Rainier National Bank be set aside.

2. That plaintiffs in the consolidated cases of Giambattista, et al v. Rainier National Bank, King County cause No. 774828, and Titus v. Rainier National Bank, King County cause No. 780285, be granted summary judgment against Rainier National Bank, as follows:

Naureen M. Giambattista, in the amount of $5,000 with interest of 5 1/2 percent per annum from May 18, 1971, until paid;

Victor W. Haller, in the amount of $10,000 with interest of 5 1/2 percent per annum from May 17, 1971, until paid;

William P. Henry, in the amount of $10,000 with interest of 5 1/2 percent per annum from May 18, 1971, until paid;

Anthony J. and Roberta A. Murad, in the amount of $10,000 with interest of 5 1/2 percent per annum from May 14, 1971, until paid;

Kaiser and Miriam Murad, in the amount of $10,000 with interest of 5 1/2 percent per annum from May 23, 1971, until paid;

Rose Murad, in the amount of $15,000 with interest of 5 1/2 percent per annum from May 23, 1971, until paid.

3. That in Vant Zelfde v. Security Savings and Loan Association, cause No. 5007–I, the summary judgment of dismissal of defendant Security Savings and Loan Association against plaintiff Vant Zelfde be set aside, and such case be remanded to the trial court *only* on the validity of the Vant Zelfde "release."

Reconsideration denied March 23, 1979.

Review denied by Supreme Court June 15, 1979.